*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0334p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee,*

    *v.*

WILBOURNE A. KELLEY III (05-1435); BARBARA
KELLEY (05-1361),

    *Defendants-Appellants.*

Nos. 05-1361/1435

>

---

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 03-90020—Marianne O. Battani, District Judge.

Submitted: June 1, 2006

Decided and Filed: August 31, 2006

Before: BOGGS, Chief Judge; KEITH and SUTTON, Circuit Judges.

---

### COUNSEL

**ON BRIEF:** Ralph H. Richardson, Detroit, Michigan, James W. McGinnis, Detroit, Michigan, for
Appellants. Christopher L. Varner, UNITED STATES ATTORNEY, Detroit, Michigan, for
Appellee.

---

### OPINION

---

KEITH, Circuit Judge. Defendant-Appellant, Wilbourne A. Kelley, III ("Kelley"), was
convicted in the United States District Court for the Eastern District of Michigan of six counts of
extortion and one count of conspiring to commit extortion, in violation of the Hobbs Act, 18 U.S.C.
§ 1951; bribery in connection with a federal program, in violation of 18 U.S.C. § 666; and making
false statements to the FBI, in violation of 18 U.S.C. § 1001(a)(2). Co-Defendant-Appellant,
Barbara Kelley, was convicted of one count of extortion and one count of conspiring to commit
extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951; money laundering, in violation of
18 U.S.C. § 1956; one count of bribery in connection with a federal program, in violation of
18 U.S.C. § 666; and making false statements to the FBI, in violation of 18 U.S.C. § 1001(a)(2).
Defendants appeal their convictions. For the reasons set forth below, we **AFFIRM**.

**I.**

This case arises out of an improper financial relationship between a county government official, who received "kickbacks," and a county contractor, who received millions of dollars in county contracts in return. Kelley was a long-time employee of Wayne County, Michigan. His wife, Barbara Kelley, was an employee of Blue Cross Blue Shield of Michigan. From 1989 through 1997, Kelley was the Assistant Wayne County CEO, head of Airport Operations and Major County Construction. He served as the Deputy Chief Operating Officer assigned to the Office of the County Executive, Edward McNamara, for the next two years. In these positions, Kelley was responsible for the operation of Wayne County's Detroit Metropolitan Wayne County Airport ("Detroit Metro Airport"). When he left Wayne County, he was one of its highest ranking executives.

In 1992, Frank Vallecorsa ("Vallecorsa"), the owner and operator of a construction business, American International, Inc. ("American International"), and an equipment rental business, United Equipment Rental, Inc. ("United Equipment"), met Kelley and other Wayne County officials to discuss obtaining business contracts. At the time, American International had never done business with Wayne County. With a "wink and a nod," a mutually beneficial financial relationship began. From 1993 through 2002, American International held substantial airport contracts. One of its contracts, worth $11.2 million, was to provide skilled maintenance workers for the airport. This contract, which earned American International profits between 5% to 7%, was renewed yearly by Kelley. American International had another Wayne County contract to provide runway lighting and sign construction at the Detroit Metro Airport, valued at $19.7 million. Finally, American International had two smaller contracts at the Detroit Metro Airport valued at $441,000 and $553,000 to perform runway pavement replacements and restroom renovations, respectively.

Kelley held authority over all of American International's Detroit Metro Airport contracts. He interviewed potential contractors and his signature started Detroit Metro Airport's procurement and contract process. Kelley's approval was necessary in order for Wayne County to provide new funds to an airport project or to establish any new airport contracts. He was also responsible for renewing existing contracts. American International's contracts were renewed on multiple occasions and amended frequently by Kelley to increase either the payout or the length. In addition, Kelley personally authored three letters to American International awarding the company airport contracts.

**A. Financial Benefits**

From 1992 through 1999, the Kelleys received significantly more than $100,000 in financial benefits from American International and its owner, Vallecorsa. The first such instance occurred in December 1992, when Kelley told Vallecorsa that his home had suffered roof damage and asked whether he could "recommend" someone to fix it. Vallecorsa, apparently appreciating Kelley's not-so-subtle hint, hired one of his subcontractors, Elio Giavonne ("Giavonne"), to repair the roof. Unfortunately for Vallecorsa, the roof was beyond repair and an entirely new roof was needed. Giavonne, after getting Vallecorsa's approval for the expenses, had a new roof and gutters installed, costing approximately $14,000.

As part of this *quid pro quo* arrangement, on May 17, 1993, Kelley granted American International a one-year Wayne County contract valued at $1 million. Shortly thereafter, the Kelleys requested Vallecorsa to make approximately $40,000 in renovations to their kitchen. Giavonne, after getting approval from Vallecorsa, replaced the kitchen cabinets, counters, and tile flooring, and added new appliances. The Kelleys' home improvements continued: a new basement floor, water heater, refinishing all the wooden floors, brick cleaning, renovations to the garage, and a finished basement. In total, Giavonne billed Vallecorsa nearly $63,000.

In the summer of 1994, Kelley approved another contract for American International worth approximately $11 million.  He sent a letter to Vallecorsa, dated August 11, 1994, officially awarding him the airport lighting and sign contract.  Thereafter, Kelley asked Vallecorsa where he bought his oriental rugs.  Vallecorsa recommended Nigosian's Oriental Rug Company ("Nigosian").  The Kelleys went to Nigosian and picked out rugs costing $28,000, which Vallecorsa agreed to purchase.  In order to fulfill their agreement, Vallecorsa would write a check payable to himself from the American International bank account.  He would then have one of his employees cash the check and would give Kelley the cash to pay the Nigosian bill.  For example, at trial the government presented evidence that showed American International writing a check to Vallecorsa for $4,500, dated November 10, 1994.  Five days later, the Kelleys paid Nigosian $4,300.  On December 9, 1994, American International wrote a check to Vallecorsa for $4,300 and on the following day the Kelleys paid Nigosian $4,300.  On January 26, 1995, American International wrote a check to Vallecorsa for $4,440.  On February 13, 1995, the Kelleys paid Nigosian $4,400.  On March 9, 1995, American International wrote a check to Vallecorsa for $4,400 and, four days later, the Kelleys paid Nigosian $4,000.

In addition to cash payments for the oriental rugs, Kelley would routinely request large amounts of cash, ranging from $2,000 to $4,000.  American International employees testified that before Kelley would visit the office, Vallecorsa would write a large check to himself, have an employee cash it, and then, after a private meeting with Kelley, the cash was never seen again.  There were fifty-nine instances where large-sum checks were written to Vallecorsa and then cashed.  There were 23 unexplained large cash deposits in the Kelleys' joint checking account near the dates when Vallecorsa cashed these large-sum checks written to himself.

Vallecorsa also made large donations to the Kelleys' favorite charities.  In 1995, he wrote checks totaling $2,000 to the Eastern Michigan University Black Alumni Association.  Vallecorsa is a white male, who never attended college, and has no ties to Eastern Michigan University.  He testified at trial that the Kelleys requested that he make several charitable donations to their selected charities totaling $16,000, including a church, where Kelley was an officer, and a community center, where Barbara Kelley was an officer.

From 1995 through 1998, the Kelleys also received free automobile repairs and service from American International.  Some of these repairs were performed at American International's service garage.  Other times, these repairs were made by professional mechanics, paid by American International.  The repairs and service included:  body work, a paint job, new tires, tune-ups, oil changes, and similar routine maintenance.

The Kelleys also requested lavish trips in exchange for airport contracts.  In 1995, the Kelleys learned that Vallecorsa was planning a trip to Italy, and they wanted to join him on this excursion.  Barbara Kelley asked Vallecorsa to finance their travel, and he agreed.  To cover airfare, Vallecorsa gave Kelley $8,000 in cash and charged the Kelleys' hotel room, totaling $2,437.84, to an American International account.  Four months later, Kelley returned the favor by approving another $1 million airport contract for American International.

Vallecorsa also helped the Kelleys keep up with the Joneses.  For example, the Kelleys were invited to attend the second inauguration of President Clinton in Washington D.C., and Barbara Kelley apparently had nothing appropriate for the occasion.  Accordingly, she asked Vallecorsa to purchase a gown for her.  On January 9, 1997, eleven days before the inauguration, Vallecorsa paid $2,050 to Barbara Kelley for a dress.  Nine days later, Kelley signed a document to begin the renewal process for American International's one-year airport maintenance contract worth $1 million.  He approved the contract two months later.

In April 1997, American International submitted a bid on the runway paving project at the Detroit Metro Airport. The airport's project managers and Wayne County field engineers recommended that American International not receive the contract because of its weak capabilities and personnel problems. Kelley decided against this recommendation and awarded the contract to American International on May 5, 1997. While American International's contract was pending, Kelley suggested to his son, Wilbourne A. Kelley, IV ("Butch Kelley"), that he meet with Vallecorsa. Butch Kelley was the personal representative and attorney for the estate of Rosabell Bush. He was removed from the estate when he mismanaged its funds. After borrowing $12,000 from his father and step-father to pay the fees he owed to the estate, Butch Kelley still had to come up with $15,000, which represented the estate's resources that he controlled. On May 2, 1997, three days before Kelley awarded American International its newest contract, Vallecorsa, through his lawyer, paid Butch Kelley's $15,000 debt.

Kelley's son cashed in on Vallecorsa's "generosity" in other ways too. In 1998, Kelley talked with Vallecorsa about hiring his son, who was unemployed at the time. Butch Kelley was hired by Vallecorsa, but needed a valid driver's license for the job. Vallecorsa provided Butch Kelley with free legal services to resolve several outstanding traffic offenses, which had resulted in the suspension of his license. With a valid license, Butch Kelley received a regular salary from American International.

In the fall of 1997, Kelley was involved in American International's $3.7 million dollar claim for extra payments under the lighting and sign contact. The airport project managers believed that American International's claim was vastly overstated. Kelley negotiated directly with Vallecorsa and settled the claim for $1.2 million. One week before the settlement, American International had written a check for $5,100 to Vallercorsa. Kelley made a $2,000 deposit one day after Vallecorsa cashed the check. Eleven days after Kelley negotiated the settlement, he deposited the remaining $3,600 into his joint checking account. One month later, the Kelleys made another $4,500 cash deposit.

On November 4, 1997, Kelley interviewed American International along with other companies for renewal of a two-year $2.4 million maintenance contract. Three days later, Kelley made a $3,600 cash deposit into his joint checking account. On November 24, 1997, Kelley approved the proposed American International two-year airport maintenance contract. On December 8, 1997, Vallecorsa cashed a $3,500 check from American International and two days later, Kelley made a $2,300 cash deposit into his joint checking account. One week later, Kelley recommended to the Wayne County Commission that the two-year maintenance contract be awarded to American International. On January 27, 1998, the Kelleys' joint checking account received a $1,000 deposit. On the same day, the Wayne County Commission approved Kelley's recommendation to grant American International the $2.4 million airport maintenance contract. While this large airport contract was still pending, Kelley asked Vallecorsa to host a dinner party to celebrate Barbara Kelley's 50th birthday. He obliged, and on January 17, 1998, the Kelleys hosted an ornate birthday celebration at the Ritz-Carlton Hotel with approximately 100 people in attendance. American International was directly billed $21,949.35 for the party by the hotel.

When Barbara Kelley gave Vallecorsa the bill for the birthday party, he initially refused to pay it. Eventually, he and Barbara Kelley came up with a plan. First, Barbara Kelley requested that the hotel reissue the bill in her name with no mention of American International or Vallecorsa. Barbara Kelley was a full-time employee at Blue Cross Blue Shield of Michigan, a health care provider. She presented an invoice for "health care consulting" to American International for the full amount of the birthday party plus an extra amount for the taxes she would have to pay. Vallecorsa wrote a $23,125 check payable to Barbara J. Kelley Health Care Consultant for the illusory health care services. Barbara Kelley cashed the check and had her bank issue a cashier's check payable to the Ritz-Carlton Hotel.

From April 1998 to August 1998, the Kelleys received $6,500 in cash from Vallecorsa. In exchange for Vallecorsa's generosity, Kelley approved a $553,000 airport contract for restroom renovations on August 18, 1998. Over the next year, the constant cash payments continued. In early 1999, Kelley indicated to Vallecorsa that he wanted to leave Wayne County and work for one of his companies. Jeffery Fanot, Vallecorsa's attorney, conducted job negotiations with Kelley in violation of Wayne County's Ethics Ordinance, which prohibited employees from such negotiations with Wayne County contractors. Kelley was eventually hired by Vallecorsa to start work in June 1999.

Before Kelley could begin his employment with Vallecorsa, he decided to take a temporary job with the Detroit Public School System. Kelley, again with a "wink and a nod," suggested that his employment with the school system would be beneficial to Vallecorsa and his companies. It only took Kelley 90 days to deliver. American International, which had done very little business with the Detroit Public Schools, received $800,000 in new business. In exchange, Vallecorsa bought Kelley a new Jeep Cherokee SUV. Additionally, Kelley received $4,900 in cash payments over the last few months of his employment with the public school system.

On January 6, 2000, Kelley started work at American International, earning a salary with benefits of $200,000. Kelley was finally fired for poor performance by Vallecorsa in 2002. Within a month, Wayne County terminated American International's largest airport contract.

## B. False Statements

The Kelleys made a number of false statements to Federal Bureau of Investigation ("FBI") agents during the 2003 investigation of their improper relationship with Vallecorsa. Kelley stated that he negotiated for his employment with Vallecorsa after he left his position with Wayne County; and that he was unaware that Vallecorsa paid $15,000 to settle the debts of his son, Butch Kelley.

Barbara Kelley told FBI agents that a check made payable to her from one of Vallecorsa's companies was not for a gown to wear to the presidential inauguration; that the payment of $23,125 for health care consulting services did not involve funds to cover the cost of her 50th birthday party; that she completed certain health care projects for Vallecorsa's companies; that she paid for her birthday party out of her own personal funds; and that neither Vallecorsa nor any of his affiliated companies paid for her 50th birthday party.

## C. Procedural History

In February 20, 2003, a grand jury indicted the Kelleys, Wilbourne and Barbara. On August 5, 2004, a grand jury entered a third superseding indictment, charging Kelley with sixteen counts of extortion, one count of attempted extortion, and one count of conspiring to commit extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951; one count of bribery in connection with a federal program, in violation of 18 U.S.C. § 666; and making false statements to the FBI, in violation of 18 U.S.C. § 1001(a)(2). Co-Defendant-Appellant, Barbara Kelley, was charged with one count of extortion, one count of attempted extortion, and one count of conspiring to commit extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951; money laundering, in violation of 18 U.S.C. § 1956; one count of bribery in connection with a federal program, in violation of 18 U.S.C. § 666; and making false statements to the FBI, in violation of 18 U.S.C. § 1001(a)(2). Before trial, the district court denied the defendant's motion to dismiss the indictment for duplicity and their motions to dismiss based upon the statute of limitations.

On September 27, 2004, a jury convicted Kelley on six counts of extortion, conspiring to commit extortion, bribery in connection with a federal program, and making false statements to the FBI. Barbara Kelley was convicted on one count of extortion, conspiring to commit extortion, money laundering, and making false statements to the FBI. The district court sentenced Wilbourne Kelley to concurrent terms of 44 months of imprisonment on the nine counts involved. Kelley was ordered

to pay $113,000 in restitution and a $30,000 fine. Barbara Kelley was sentenced to concurrent terms of 41 months of imprisonment on the five counts; a $30,000 fine; and restitution. On February 14, 2005, the Kelleys filed a timely notice of appeal to this court.

## II.

The Kelleys raise the following four issues on appeal: (1) whether there was sufficient evidence to support their convictions; (2) whether their indictments were duplicitous; (3) whether the defendants were improperly joined; and (4) whether the trial court erred in denying a new trial due to juror misconduct. We analyze each of these arguments in turn.

## A.  Sufficiency of the Evidence

The Kelleys first argue that the government's evidence presented at trial was insufficient to sustain their convictions and, thus, the district court erred in denying their motion for judgment of acquittal. Specifically, Kelley challenges the sufficiency of the evidence supporting all of his convictions. Barbara Kelley challenges the sufficiency of the evidence on all counts except count one, the Hobbs Act conspiracy charge. This court reviews *de novo* whether the evidence is sufficient, determining if after viewing all evidence in the light most favorable to the prosecution, any reasonable jury could find guilt beyond a reasonable doubt. *United States v. Talley*, 164 F.3d 989, 996 (6th Cir.), *cert. denied,* 526 U.S. 1137, 119 S. Ct. 1793 (1999). A defendant making such a challenge bears a very heavy burden. *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir.), *cert. denied,* 528 U.S. 1033, 120 S. Ct. 560 (1999). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *Id.* (internal quotation marks and citation omitted). The jury may draw any reasonable inferences from direct, as well as circumstantial, proof. *See id.* Once a conspiracy has been proven, only slight evidence is necessary to implicate a defendant as a participant in that conspiracy if the evidence shows the connection beyond a reasonable doubt. *See United States v. Braggs*, 23 F.3d 1047, 1051 (6th Cir. 1994).

### 1.  Count One – Hobbs Act Conspiracy

Count one of the third superseding indictment charged that the Kelleys conspired to extort money and property from Vallecorsa and his companies in exchange for millions of dollars in Wayne County airport contracts under color of official right, in violation of the Hobbs Act, 18 U.S.C. § 1951.[1] To establish an insufficiency of the evidence claim on this Hobbs Act conspiracy charge, the Kelleys must show that the government failed to prove beyond a reasonable doubt the elements of the crime. The evidence adduced at trial, however, amply supports the Kelleys' conviction of Hobbs Act conspiracy.

---

[1]   The Hobbs Act provides in pertinent part:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

(b) As used in this section—

. . . .

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

The government proved that there was an agreement to commit extortion, under either the "color of official right" or "fear of economic harm" theory. Under the "color of official right" theory, a public official like Kelley obtains a "payment to which he was not entitled, knowing that the payment was made in return for official acts." *Evans v. United States*, 504 U.S. 255, 268, 112 S. Ct. 1881, 1889 (1992). Barbara Kelley, as a private citizen, can be convicted of aiding and abetting a public official in the official's extortion, and for conspiring with a public official to commit extortion, under this theory as well. *See United States v. Collins*, 78 F.3d 1021, 1031-33 (6th Cir. 1996). Here, there was extensive evidence showing that the Kelleys received cash, parties, home renovations, auto repairs, and a new car from Vallecorsa in exchange for favorable treatment in granting or renewing his company's airport contracts. Under the "fear of economic harm" theory, the defendant receives payment from the victim because the victim believes that the defendant can exercise his or her power to the victim's economic detriment. "The fear need not be the product of the defendant's actions. 'It is enough if the fear exists and the defendant intentionally exploits it.'" *Id.* at 1030 (quoting *United States v. Williams*, 952 F.2d 1504, 1513-14 (6th Cir. 1991)). Private citizens can also be convicted under the "fear of economic harm" theory. *See id.* Vallecorsa had good reason to fear that the Kelleys would use their influence over his company's multi-million dollar airport contracts to cause him harm. Kelley held authority over all of American International's Detroit Metro Airport contracts. In fact, when Vallecorsa fired Kelley in 2002, he lost his largest airport contract within a month. Finally, the government also showed that there was a *de minimis* connection to interstate commerce; that the defendants knew of the conspiracy and intended to join it; and that they participated in it.

At trial, the evidence demonstrated that the Kelleys worked together in their efforts to extort American International, including a lavish birthday party for Barbara Kelley, automobile repairs, cash, various charitable donations, and employment for both Kelley and his son. The Kelleys took turns asking Vallecorsa for money and services. For example, Kelley first raised the idea to Vallecorsa to pay for Barbara Kelley's birthday party. Barbara Kelley followed through on the plan by working out the billing details and providing false invoices for consulting work that she did not perform. The Kelleys were able to fleece Vallecorsa so readily because of the power Kelley held over American International's multi-million dollar airport contracts. As described above, there was an implicit *quid pro quo* between Vallecorsa and Kelley. The more money Vallecorsa gave Kelley, the better things got for his companies. American International continued to have its existing airport contracts renewed and larger new contracts were being issued. Therefore, we conclude that a reasonable juror could have found Kelley guilty beyond a reasonable doubt of Hobbs Act conspiracy.

### 2. Count Two – Extortion for Barbara Kelley's 50th Birthday Party

Barbara Kelley first argues that she is not and has never been employed by Wayne County and therefore could not act under "color of official right." It is well settled in this Circuit that "a private citizen who is not in the process of becoming a public official may be convicted of Hobbs Act extortion under the 'color of official right' theory only if that private citizen either conspires with, or aids and abets, a public official in the act of extortion." *United States v. Saadey*, 393 F.3d 669, 675 (6th Cir. 2005). Barbara Kelley's position that Kelley, as the only government actor, did not participate in the agreement between Barbara Kelley and Vallecorsa to pay for her 50th birthday party is without merit. At trial the prosecution presented sufficient evidence that Kelley initiated the conversation with Vallecorsa regarding Barbara Kelley's 50th birthday party. (J.A. 1071.) Since we must view the facts in the light most favorable to the prosecution, Barbara Kelley's argument fails. For the same reason, Kelley's assertion that he was not involved in securing $23,125 for his wife's birthday party fails. Accordingly, we hold that there was sufficient evidence for the jury to find the Kelleys guilty of count two of the third superseding indictment.

### 3.  Count Four – Extortion for Employment of Butch Kelley & Count Five – Extortion for Employment of Kelley

Vallecorsa employed both Kelley and his son, Butch Kelley.  Kelley contends that there were no specific acts that could be attributed to him relative to his son's employment.  He appears to concede, however, that he told his son to call Vallecorsa about employment.  *See* Kelley's Br. 42.  The government argues and we agree that there is sufficient evidence for the jury to convict Kelley of extorting his son's employment.  First, Kelley told his son to talk to Vallecorsa about a job.  It is fair to say that Butch Kelley was not "cold-calling" Vallecorsa.  By July 1998, the Kelleys had received thousands of dollars cash, house renovations, car repairs, and donations to their favorite charities, and Butch Kelley was already the recipient of a $15,000 gift to satisfy a debt.  A reasonable jury could have easily determined that when Butch Kelley showed up to talk to Vallecorsa about a job, Vallecorsa acted under threat of economic harm, as Butch Kelley's father controlled millions of dollars of airport contracts that benefitted his business.  Likewise, a reasonable jury could have determined that Kelley extorted his own job with American International.  He negotiated his position while he was still an employee of Wayne County.  Additionally, when he was an employee for the Detroit Public Schools, the job he held right before he took a position with Vallecorsa, Kelley was responsible for giving hundred thousand dollar contracts to American International.  Kelly has failed to meet his burden of showing that no reasonable jury could find him guilty.  There is sufficient evidence to support a jury finding of guilty on this count.

### 4.  Count Ten  – Cash Payment of $3,200, Count Eleven – Cash Payment of $2,200, & Count Nineteen – Cash Payment of $3,600

Kelley was convicted of extorting cash payments of $3,200, $2,200, and $3,600.  The events leading to the charges in counts 10 and 11of the third superseding indictment took place in March 1999, when Kelley was still employed at Wayne County.  The events leading to the charges in count nineteen of the third superseding indictment occurred during Kelley's tenure at the Detroit Public Schools.  Kelley contends that these cash payments were never established because Vallecorsa could not say exactly when he gave the money to Kelley.  Additionally, Kelley argues that there was no association between the money given to him and the favors rendered to Vallecorsa's companies.  Kelley's argument is without merit.

Viewing the evidence in a manner most favorable to the government, we conclude that a reasonable jury could have found that these cash payments were extorted from Vallecorsa under either of the government's theories.  Under the "color of official right" theory, the money was extorted in exchange for favorable treatment in granting or renewing both airport and public school contracts, respectively.  Under the "fear of economic harm," the money was extorted from Vallecorsa because he feared that the Kelleys would use their influence over the company's contracts to cause his company financial harm.

Finally, Kelley's argument that the government could not say exactly when Vallecorsa gave the money to Kelley is without merit.  The government presented credible evidence of a distinct pattern of large checks written to Vallecorsa and then cashed.  Within days, a similarly large cash deposit would be deposited in the Kelleys' joint checking account.  The Kelleys had their employment checks directly deposited to their joint checking account on a regular basis and had no other reason to have such large cash sums deposited in an otherwise erratic fashion.  Additionally, the prosecution called five witnesses to testify about this pattern of cash payments.  Since circumstantial evidence alone is sufficient to sustain a conviction, *Spearman*, 186 F.3d at 746, we therefore find that a reasonable trier of fact could have found Kelley guilty on these counts.

### 5. Count Seven – Bribery in Federal Programs

There is sufficient evidence to find the Kelleys guilty of soliciting, demanding, or accepting items of value, which are intended to reward or influence them in the business of local government when such government entity received more than $10,000 in federal benefits. The jury could have found that Kelley participated in a federal program bribe when he solicited and accepted a $23,125 birthday party for his wife at the Ritz-Carlton Hotel, as a government official. Likewise, there is sufficient evidence to convict Barbara Kelley of aiding and abetting Kelley's crime. *Saadey*, 393 F.3d at 675. We therefore affirm the Kelleys' conviction on this count.

### 6. Counts Twenty-Four & Twenty-Five – False Statements to the FBI

Count twenty-four alleges that Kelley made false statements to FBI agents. In particular, the government claims that Kelley lied to FBI agents when he told them that he conducted his job negotiations with American International after he left his employment with Wayne County; and that he was unaware that American International paid $15,000 to settle a debt for his son Butch Kelley. Kelley argues that the government cannot rely on the "abstract" testimony of Jeffrey Fanto, Vallecorsa's lawyer. The jury, however, is free to credit the testimony of Vallecorsa and Fanto that they conducted job negotiations with Kelley before he left Wayne County and before he started working for American International. This evidence is buttressed by the fact that Kelley was provided a new car paid for by American International before he left Wayne County employment. He drove this car throughout his employment with American International.

Kelley also argues that his son on both direct and cross-examinations denied that he disclosed to his father that he went to Vallecorsa to repay a debt. Butch Kelley's testimony, however, was impeached at trial as inconsistent with his earlier statements to the FBI. Accordingly, the jury can consider as substantive evidence that Kelley told his son to talk to Vallecorsa. Thus, taking the evidence in the light most favorable to the government, there is sufficient evidence to sustain the jury's decision to find Kelley guilty on count twenty-four of the third superseding indictment.

Barbara Kelley also argues that there was insufficient evidence to sustain her conviction for making false statements to the FBI. She told FBI agents that she paid for the subject birthday party out of her own funds. There was sufficient evidence to disprove this assertion as she received a check from Vallecorsa to cover the expense for the party. She also told FBI agents that neither Vallecorsa nor any of his companies paid for the party, but that the $23,125 check from Vallecorsa was for consulting services that she performed for his company and did not involve the birthday party. Finally, the indictment charged that Barbara Kelley made a false statement when she told FBI agents that the check made payable to her for $2,050 and written eleven days before President Clinton's second inauguration was not to buy a gown for the President's inauguration party. There was sufficient evidence, as detailed above, for the jury to find that Barbara Kelley lied in these instances and, accordingly, we affirm her conviction on this count.

### 7. Count Six – Money Laundering

Barbara Kelley argues that there was insufficient evidence to convict her on charges of money laundering. To establish her claim, she must show that the government failed to prove beyond a reasonable doubt that she conducted or attempted to conduct a financial transaction with money that she extorted from Vallecorsa; that she knew the money was proceeds from her extortion; and that she knew that the transaction was designed to conceal or disguise the nature of the proceeds she gained by her extortion. *See United States v. McGahee*, 257 F.3d 520, 526 (6th Cir. 2001). We find that the jury was clearly able to assess the great lengths Barbara Kelley took to conceal the true nature of the payment of the Ritz-Carlton Hotel bill. She had the hotel reissue the bill in her name to remove any mention of American International or Vallecorsa. She developed a scheme with Vallecorsa to

generate a fake invoice for consulting services that were never performed. Amazingly, she was not even willing to suffer the tax consequences of the additional income that she would have to report under her grand plan. The check written out to "Barbara J. Kelley Health Care Consultant" was written for more than the cost of the party in order to cover the Kelleys' increased tax liability. We cannot say that the jury was irrational in finding that Barbara Kelley committed all the elements of the money laundering crime for which she was charged. Thus, there is sufficient evidence to sustain the jury's finding of guilty on this count, as well as all counts of the third superseding indictment on which the Kelleys were convicted.

## B. Duplicity

Whether an indictment is duplicitous is a legal question that this court reviews *de novo. United States v. Campbell,* 279 F.3d 392, 398 (6th Cir. 2002). "The yardstick in determining whether there is duplicity or multiplicity is whether one offense or separate offenses are charged, and . . . this is a difficult and subtle question." 1A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 142, at 17 (3d ed. 1999). However, "[t]he allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for '[t]he conspiracy is the crime, and that is one, however diverse its objects.'" *Braverman v. United States*, 317 U.S. 49, 54, 63 S. Ct. 99, 102 (1942) (quoting *Frohwerk v. United States*, 249 U.S. 204, 210, 39 S. Ct. 249, 252 (1919)). An indictment does not charge multiple conspiracies if there is "one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy;" in this case, "the agreement among all the parties constitutes a single conspiracy." *United States v. Mayweather*, 57 F.3d 1071, at *5, 1995 U.S. App. LEXIS 15395, at *15 (6th Cir. June 16, 1995) (unpublished opinion) (citing *United States v. Abraham*, 541 F.2d 1234, 1238 (7th Cir. 1976)); *see also United States v. Gordon*, 844 F.2d 1397, 1401 (9th Cir. 1988); *United States v. Radtke*, 415 F.3d 826, 838-39 (8th Cir. 2005).

Here, count one of the indictment, which charges the Kelleys with conspiracy to commit Hobbs Act extortion, lists numerous examples of acts and attempted acts to garner over $100,000 from the same person. This grand scheme was a continuing conspiracy between co-conspirators, taking place over many years, beginning with Kelley's employment at Wayne County and continuing through his short tenure with the Detroit Public Schools. After our careful reading of the indictment, we agree with the district court, in as much, as count one of the indictment describes various events, which are part of one large scheme, to fleece Vallecorsa. Accordingly, we affirm the district court's decision that count one of the indictment was not duplicitous.

## C. Joinder

Barbara Kelley argues that the government improperly joined the two defendants. Her argument is without merit. Federal Rule of Criminal Procedure 8(b) allows joinder of defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." FED. R. CRIM. P. 8(b). Joinder is permissible in a conspiracy count and substantive counts arising out of the conspiracy because the fundamental principle of a conspiracy charge is the agreement to a common plan or scheme to perpetrate some illegal activity. *See* Wright & Miller, *supra*, § 144 at 53-54. In fact, "Rule 8(b) codifies the long-standing practice of trying conspirators together . . . ." *United States v. Velasquez*, 772 F.2d 1348, 1353 (7th Cir. 1985). Here, the evidence clearly shows that the Kelleys were partners, agreeing to take as much from Vallecorsa and his construction business as possible. Although both defendants did not participate in all acts detailed in the indictment, it is sufficient that they both participated in at least one act in the series of acts that constituted the offense. Accordingly, the district court did not err in joining the Kelleys in this trial.

### D.  Motion for New Trial Based on Juror's Comments

The Kelleys argue that the jury engaged in misconduct and that a new trial is warranted because jurors spoke to the Detroit Free Press about their views on whether the Kelleys should have testified on their own behalf.  Specifically, a juror stated that "I was also struck by the fact that neither of the Kelleys testified.  If they were innocent, they would have testified." (J.A. 464.)  The district court denied the post-trial motion for a new trial, finding that this evidence was insufficient to grant a new trial.  We agree.

A district court's denial of a motion for a new trial is reviewed for abuse of discretion. *Greenwell v. Boatwright,* 184 F.3d 492, 499 (6th Cir. 1999). "Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." *Id.* (quoting *Powers v. Bayliner Marine Corp.,* 83 F.3d 789, 796 (6th Cir. 1996)) (internal quotation marks omitted).

The jurors' statements to the newspaper fall within the scope of FED. R. EVID. 606(b), which states:

> **(b) Inquiry into validity of verdict or indictment.**
> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.  Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

FED. R. EVID. 606(b).

Under Rule 606(b), any evidence regarding a juror's thoughts about the trial, if offered to impeach the jury's verdict, is incompetent and cannot be admitted. *United States v. Gonzales*, 227 F.3d 520, 524 (6th Cir. 2000).  Post-trial jury scrutiny is disfavored because of its potential to undermine "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople." *Tanner v. United States*, 483 U.S. 107, 120-21, 107 S. Ct. 2739 (1987).  The only two exceptions to this rule occur when extraneous prejudicial information is improperly brought to the jury's attention, and when outside influence was improperly brought to bear upon any juror.  FED. R. EVID. 606(b).  The question before the court is whether a juror's consideration of a defendant's failure to testify constitutes  a permissible internal influence or an impermissible external or extraneous influence.

In *United States v. Rodriquez*, 116 F.3d 1225 (8th Cir. 1997), the defendant raised the same argument that the Kelleys make on their appeal, namely that his failure to testify was not evidence and should not have been considered; and accordingly that this testimony is the type of "outside influence" to which the jurors are allowed to testify.  *Id.* at 1226-27.  The court rejected this argument, noting:

> That Rodriquez did not testify is not a fact the jurors learned through outside contact, communication, or publicity.  It did not enter the jury room through an external, prohibited route.  It was part of the trial, and was part of the information each juror collected.  It should not have been discussed by the jury, and indeed was the subject

of a jury instruction to that effect.  But it was not "extraneous information," and therefore does not fall within the exception outlined in Rule 606(b).

*Id.* at 1227.  We agree with our sister circuits that because the juror did not learn of the Kelleys' failure to testify through improper channels, a juror's discussion regarding this fact does not fall within either Rule 606(b) exception.  *See, e.g.*, *United States v. Rutherford*, 371 F.3d 634, 639 (9th Cir. 2004) (juror discussion of defendant's failure to testify in violation of court's instructions is inadmissible); *United States v. Tran*, 122 F.3d 670, 672-73 (8th Cir. 1997) (holding that discussions of defendant's failure to testify were "not 'extraneous prejudicial information,' and therefore [did] not fall within the exception outlined in Rule 606(b)") ; *United States v. Martinez-Moncivais*, 14 F.3d 1030, 1036-37 (5th Cir.), *cert. denied*, 513 U.S. 816, 115 S. Ct. 72 (1994) (holding that post-trial statements that juror believed that if the defendant had been innocent, he would have taken the stand, did not fall into the "narrow exception that arises when there is evidence of outside influences on the jury"); *United States v. Voigt*, 877 F.2d 1465, 1469 (10th Cir. 1989) (same); *United States v. Friedland*, 660 F.2d 919, 927-28 (3d Cir. 1981) (same); *see also United States v. Pavon*, 618 F. Supp. 1245, 1247 (S.D. Fla. 1985) (holding jury deliberations focused on discussions concerning defendant's failure to testify, contrary to court instructions, did not entitle defendant to judicial investigation of jury deliberations), *aff'd,* 802 F.2d 1397 (11th Cir. 1986); *United States v. Edwards*, 486 F. Supp. 673, 674 (S.D.N.Y) (same), *aff'd,* 631 F.2d 1049 (2d Cir. 1980).  Accordingly, we affirm the district court's decision to deny the Kelleys a new trial.

## III.

We have considered all of the defendant's arguments on appeal and find no reason for reversal.  For the foregoing reasons, we **AFFIRM** the Kelleys' convictions.