IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

January 8, 2019 Session

### STATE OF TENNESSEE v. SHAWN GIBSON DELOSH

**Appeal from the Circuit Court for Dyer County**
**No. 16-CR-324      R. Lee Moore, Jr., Judge**

_____

### No. W2018-00272-CCA-R3-CD

_____

The Defendant-Appellant, Shawn Gibson Delosh, was convicted by a Dyer County jury of promoting the manufacture of methamphetamine, see Tenn. Code Ann. § 39-17-433(a)(1), for which he received a sentence of twelve years, to be served consecutively to his prior sentences and parole revocations. On appeal, the Defendant argues that (1) the evidence was insufficient to support his conviction, and (2) the trial court improperly ordered his sentence to be served consecutively to "all prior sentences and/or parole revocations." Upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and J. ROSS DYER, J., joined.

H. Tod Taylor, Assistant District Public Defender, for the Defendant-Appellant, Shawn Gibson Delosh.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; and Danny Goodman, Jr., District Attorney General, for the Appellee, State of Tennessee.

### OPINION

During the execution of a search warrant at the Defendant's home, deputies with the Dyer County Sheriff's Department found aluminum foil with methamphetamine residue, a plastic drink bottle (also known as a "shake bottle"/"shake lab") used to cook methamphetamine, three empty cans of flammable liquids (also known as "camp fuel"), and several fire pits/burn piles containing "sludge"/remnants from methamphetamine cooking. The Defendant admitted to using methamphetamine, but he denied any knowledge of the production or manufacture of the substance. He was later charged and

convicted of promoting the manufacture of methamphetamine and received a sentence of twelve years incarcerated, to be served consecutively to "all prior sentences and/or parole revocations." The following proof was adduced at trial.

On September 26, 2016, Tim McCraw was contacted regarding rental property located at 86 Parker Road, Dyersburg, Tennessee (the property), which was leased to Beth McDonald and the Defendant. He testified that they had lived at the property since May 2016, and that no other adults lived at the home. McCraw identified several photographs of his property at trial, which were shown to the jury and admitted as exhibits. He confirmed that there had been a large party on the property at some point, which the sheriff's department "shut down." Tamika Holman also testified and assisted deputies during the search of the property. She found "aluminum foil with residue of used . . . meth" inside a garbage can in a bedroom. She also found a "shake bottle" near "a pile beside the shed" in the back yard.

Investigator Stoney Hughes of the Dyer County Sheriff's Office testified that he had specialized training in the area of clandestine meth labs or "homemade meth labs." He assisted in the search of the property and arrived "[j]ust before 11 [a.m.]." The Defendant and his girlfriend were in the bedroom, and it "took several minutes to get someone to come to the door." Investigator Hughes found "aluminum foil that had burn marks on it, as well as a plastic bag corner," both of which were indicative of meth use. Photographs of the items and where they were found were shown to the jury and admitted into evidence. Investigator Hughes said that the Defendant admitted that the paraphernalia found inside the house belonged to him, that he was a meth user, and that "he buys his dope."

Investigator Hughes also searched the outside of the residence and explained that

Through my experience, when someone is cooking meth, it's difficult to discard the remnants of a shake lab or the gas generator. Pretty much the only way to get rid of the evidence is to attempt to burn it. It's very common and one of the things that we do is look for what we call burn piles. We see if we can locate where they've been cooking meth.

He testified that there was a "burn pile" at the southern end of the property, and that many of the components necessary for the production of methamphetamine had been destroyed in it. He found a "Dr. Pepper bottle" in the yard between the shed and the house, which he identified as a gas generator. Investigator Hughes further explained the significance of the hole in the top of the bottle as follows:

They'll stick a tubing into the hole and shake the bottle and the acid as it mixes the sulfuric acid, as it mixes with the salt will create the hydrochloric gas and it will go through the tubing and then it'll go down. Whatever container they have the liquid in to turn it back into a salt. It's called gassing it off.

He confirmed residue from the hydrochloric acid remained inside the bottle. The bottle was found laying in leaves with nothing on top of it. He also identified several cans of camp fuel and paint thinner, both flammable liquids commonly used as a solvent for shake labs, found on the property. No other camping material such as lanterns or gas stoves used for legitimate purposes were found. The jury was shown a photograph upon which Investigator Hughes identified where the items were found in the backyard of the property.

Investigator Hughes opined that the items recovered from the backyard of the property had not been there for very long because the camping fuel can had no dirt on it. He said that the meth lab was "a couple of weeks [old] at most" because the bottle still had white residue inside and the outside was clean. A video showing Investigator Hughes "neutralize" the shake bottle meth lab was also played for the jury and admitted into evidence. Asked if there was anything in the backyard area of the property to indicate that the residents would use that area, Investigator Hughes said there were toys, a swing set, and a trampoline that had been closer to the house. He estimated the cost of "a ball" or a gram of methamphetamine was $50 or $75. He confirmed that Investigator Ricky Gregory found the cans of camp fuel and paint thinner. He further agreed that certain components necessary to produce methamphetamine were not found on the property including "pseudophed pills," blister packs, and lithium batteries. However, ammonium nitrate and sodium hydroxide were presumed to be within the sludge. He confirmed that the Defendant admitted he was a meth user; however, he denied any knowledge of the items found outside the house.

Chief Glen Cook with the Dyer County Sheriff's Department was present during the search of the property and was responsible for securing the property and moving all individuals to the front living room area of the house. He said the Defendant, Beth McDonald, three girls, and a juvenile boy were present at the time of the search. He observed the Defendant to be "nervous," "agitated," and "under the influence." He took a video recording with his phone showing Investigator Hughes neutralize the shake lab. While he recorded the process, he observed a "sort of reaction" because it was "bubbling or fizzing."

Investigator Rick Gregory of the Dyer County Sheriff's Department testified that he was experienced in investigating clandestine meth labs and that he was present during

the search of the property. While searching the perimeter of the property, he observed several items related to the manufacture of methamphetamine including a Dr. Pepper bottle and confirmed that it was a gas generator. He further observed two empty cans of Coleman type stove fluid, which he found laying in the bushes. He also found paint thinner within "a 10 or 12 foot radius" of the camp fluid. He said these items were found "35 to 40 feet" from the house.

**Defense Proof.** The Defense recalled Tim McCraw, who clarified that there were two sheds on his rental property. He explained two photographs of the sheds that were taken from different angles. Tracy Jones, an investigator for the Defendant, testified that he had taken the photographs of the sheds on the property a few days prior to trial. He said some of the photographs showed garbage that was behind "a little creek bank or something." Danny Fowlkes, the Dyer County Register of Deeds, testified that the last time a house was registered with his office as quarantined was in 2014.

At the time of the search, Beth McDonald had lived at the property with the Defendant, her three children and her oldest daughter, Aliegha Landers, and her boyfriend, Shawn Phillips. She testified that they had lived there since April. Although she was aware that the Defendant had used methamphetamine in the past, she had not observed any illegal activity on the property. She confirmed that a large party occurred on the property "towards the end of June," with three or four hundred guests. She identified photographs that were admitted into evidence showing (1) a party and a bonfire; (2) her daughter and her boyfriend from the night of the party; (3) guests at the party using fire batons; and (4) set up for the party and DJ equipment. She said they had "several" bonfires at the party and used camping fuel and gasoline to ignite them. Shawn Phillips and Aliegha Landers testified consistently with the testimony of Beth McDonald. Aliegha Landers also testified that she had never witnessed "any cooking of methamphetamine by anyone" while they lived at the property. She said the party occurred in June 2016, approximately three months before the search of the property.

At the beginning of the Defendant's testimony, he was shown the photograph of the Dr. Pepper bottle and explained that he had never seen it. He confirmed that the party occurred on the property in June and that camping fuel and other "facilitants" were used to start the bonfire. He denied any knowledge of "meth sludge" as described by Investigator Hughes. Asked "You have heard the people testify that you have used methamphetamine?" The Defendant replied, "Yes. I don't . . . I don't know, you know, that I have used it." He confirmed that he told the police that he "bought [his] dope," and explained he did so because it was cheaper than making it. He said he was purchasing meth for $30 a gram rather than buying the ingredients, which cost over $100. He denied cooking methamphetamine. According to the Defendant, before finding anything on the property, Investigator Hughes told the Defendant that he "put [the Defendant] in prison

- 4 -

last time, [and] he was going to put [the Defendant] in prison this time too." On cross-examination, the Defendant agreed that he had been addicted to methamphetamine for almost fifteen years. He further agreed that upkeep of the property was his responsibility and that his brother was paid to mow the lawn.

Investigator Hughes was recalled and testified that both sheds on the property were searched, no meth components were found, and nothing from those structures was recovered at the time of the search. He further explained that houses are registered to be quarantined only when there is an active meth lab found inside the house. Because the entirety of this meth lab was found outside the house, it was not quarantined. He stated the grass underneath the Dr. Pepper bottle was still alive when it was recovered, which indicated that the meth lab was "very recent" or "no more than a couple of weeks." Investigator Hughes did not recall making the statements attributed to him by the Defendant at the time of the search.

Following deliberation, the jury found the Defendant guilty of promoting the manufacture of methamphetamine.

**Sentencing Hearing.** At the November 6, 2017 sentencing hearing, the Tennessee Department of Correction's investigation report and West State Corrections' supervision report were admitted into evidence without objection. The trial court asked counsel for the Defendant if there were "any exceptions from the defense to [the presentence reports]," and counsel responded, "Judge, I don't believe that there was any exceptions[.]" However, during her sentencing argument, counsel for the Defendant argued:

> Range is a beyond a reasonable doubt standard. We believe the issue of probation and parole is a beyond a reasonable doubt issue also, and we don't think that—by not putting up any evidence here today, we don't think the State's proven, beyond a reasonable doubt, that my client was on parole at the time. So, we're asking the Court to make the 12-year sentence concurrent with the sentence that he's doing now.

In response, the State insisted that parole had been established, at a minimum, by the Defendant's testimony at trial. The trial court determined that with "eight prior felony convictions and two prior misdemeanor convictions . . . [the Defendant was] a career offender." The court applied enhancement factor (1), that the defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range, see Tenn. Code Ann. § 40-35-114(1), and no mitigating factors. The court stated, "It is an extremely long history of criminal convictions and behavior, rehabilitation does not appear to be good. He has a long

history of criminal conduct, confinement is necessary to avoid depreciating the seriousness of the offense." Noting that the Defendant was in fact on parole for his prior sentence when the instant crime occurred, the court imposed a twelve year sentence, which, by law, was ordered to be served consecutively to his prior sentence. On December 4, 2017, the Defendant filed a motion for new trial, which was denied by the trial court. It is from this order that the Defendant now appeals.

## ANALYSIS

**I. Sufficiency of the Evidence.** The Defendant argues that the evidence is insufficient to support his conviction. Specifically, the Defendant argues that, at best, the evidence "indicates [] possession or sale of a narcotic rather th[a]n promotion of the manufacture of methamphetamine." The Defendant asserts that the State failed to prove that the Defendant "had his hands on any of" the evidence and failed to prove that he was in "constructive possession" of the evidence. The State responds that the evidence, including materials used to cook methamphetamine and the Defendant's own admissions that he bought and used methamphetamine, was sufficient to sustain the Defendant's conviction. The State also argues that the evidence was sufficient to show that the Defendant exercised dominion and control over his residence and property, and that the jury could conclude that he was in actual or constructive possession of the methamphetamine evidence. Upon our review, we agree with the State.

In resolving this issue, we apply the following well-established standard of review. The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This

court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

Here, the Defendant was convicted of promoting the manufacture of methamphetamine. An individual is guilty of promoting methamphetamine manufacture if he or she "[s]ells, purchases, acquires, or delivers any chemical, drug, ingredient, or apparatus that can be used to produce methamphetamine, knowing that it will be used to produce methamphetamine, or with reckless disregard of its intended use[.]" Tenn. Code Ann. § 39-17-433(a)(1). "'Manufacture' means the production, preparation, propagation, compounding, conversion or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis[.]" Tenn. Code Ann. § 39-17-402.

The Defendant does not dispute that items consistent with promoting the manufacture of methamphetamine were found on his property at the time of the search. Instead, he insists that the State failed to establish constructive possession of the contraband. In this vein, we recognize that possession may be actual or constructive. See State v. Robinson, 400 S.W.3d 529, 534 (Tenn. 2013) (citing State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001)). If possession is deemed to be constructive, there must be proof that the accused had "'the power and intention at a given time to exercise dominion and control over . . . [the drugs] either directly or through others.'" Id. (internal citations omitted). The mere presence of an individual in an area where drugs are found is not sufficient, standing alone, to find constructive possession. Id. (citing State v. Bigsby, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000)). Moreover, constructive possession depends on the totality of the circumstances in each case. It may be proven by circumstantial evidence. Tenn. Code Ann. § 39-17-419 (2006) (stating that possession may be inferred from "relevant facts surrounding the arrest"). Circumstantial evidence is sufficient to sustain a defendant's conviction even if the evidence does not "remove every reasonable hypothesis except that of guilt." Id. (citing State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011) (quoting United States v. Kelley, 461 F.3d 817, 825 (6th Cir. 2006)).

Viewed in the light most favorable to the State, the proof adduced at trial showed that deputies from a specialized drug unit conducted a search on the Defendant's property, during which they found tools and ingredients indicative of methamphetamine manufacture. Specifically, they found aluminum foil with methamphetamine residue in the Defendant's bedroom, a "shake bottle" or "shake lab" used to cook

methamphetamine, three empty cans of flammable liquids, and several fire pits/burn piles containing "sludge"/remnants from methamphetamine cooking. The bottle or gas generator, the two empty cans of Coleman type stove fluid, and the paint thinner were all located within "35 to 40 feet" from the Defendant's house. The "shake bottle lab" was described as "fresh" or made within "a couple of weeks" because it still had hydrochloric acid inside, was not covered in debris, and the grass beneath it was alive. Moreover, the Defendant, as the property lessor, was responsible for the upkeep of the property. He testified that his brother mowed the lawn of the property, and that the Defendant frequently went into the yard to play with the children. Based on this evidence, a reasonable juror could infer that the Defendant exercised dominion or control over the shake bottle and other items indicative of methamphetamine production that were found in close proximity of his home. Accordingly, we conclude that the evidence was sufficient for a jury to convict the Defendant of promoting the manufacture of methamphetamine, and he is not entitled to relief on this issue.

**II.    Sentencing.** In a single paragraph, the Defendant contends that "a determination of mandatory consecutive sentencing pursuant to Rule 32(c)(3)(A) of the Rules of Criminal Procedure for a felony committed while on parole for a felony should [] be proven beyond a reasonable doubt." He specifically argues that the trial court abused its discretion in imposing a consecutive sentence because "[t]he only proof of the Defendant's parole status . . . was via hearsay in the T.D.O.C. presentence report." He further argues that the report contained unreliable hearsay and should not have been admitted. In response, the State argues, and we agree, that the trial court properly imposed consecutive sentencing in this case.

We apply an abuse of discretion standard, accompanied by a presumption of reasonableness, to consecutive sentencing determinations. State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013). Rule 32 of the Tennessee Rules of Criminal Procedure provides, in relevant part, as follows:

> (3) *Mandatory Consecutive Sentences.* When a defendant is convicted of multiple offenses from one trial or when the defendant has additional sentences not yet fully served as the result of convictions in the same or other courts and the law requires consecutive sentences, the sentence shall be consecutive whether the judgment explicitly so orders or not. This rule shall apply:
>
> (A) to a sentence for a felony committed while on parole for a felony[.]

Tenn. R. Crim. P. 32(c)(3)(A).

At the top of the sentencing hearing, the trial court specifically asked if there were objections to the presentence report, and the parties indicated there were none. However, defense counsel voiced her concern that the State had failed to establish "beyond a reasonable doubt" that the Defendant was on parole at the time of the offense. The presentence report showed, among other things, that the Defendant "was under parole supervision for his conviction in Dyer Circuit #11CR161 when he committed his instant offense in Dyer Circuit Court #16CR324." Given the information in the presentence report, consecutive sentencing was mandatory, and the trial court properly imposed a twelve-year sentence consecutive to the prior unrelated parole. The Defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing reasoning and analysis, the judgment of the trial court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE