**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a1082n.06

**No. 11-5986**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
*Oct 16, 2012*
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| MARQUEZ CRENSHAW, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | MIDDLE DISTRICT OF TENNESSEE |
| HARRY STEWARD, Warden, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |

Before: SUTTON and GRIFFIN, Circuit Judges; WELLS, District Judge.[*]

SUTTON, Circuit Judge. In 1999, a Tennessee jury convicted Marquez Crenshaw of an assortment of robbery, burglary and kidnapping charges, and the trial court sentenced him to twenty-seven years in prison. After unsuccessfully seeking collateral relief from the state courts, he filed a petition for a writ of habeas corpus in federal court. The district court denied the petition on two grounds: It was procedurally defaulted and time barred. We affirm the procedural-default ruling and need not reach the time-bar ruling.

I.

---

[*]The Honorable Lesley Wells, Senior United States District Judge for the Northern District of Ohio, sitting by designation.

Between the hours of 2 a.m. and 4 a.m. on November 12, 1998, four masked men pretending to be police officers broke into the two-bedroom home of Betty Jean Mitchell. Mitchell and her boyfriend were asleep in one bedroom, and Mitchell's two sons, eighteen-year-old Mario Mitchell and thirteen-year-old Geno Smith, were asleep in the other bedroom.

The four men bound Ms. Mitchell, her boyfriend and Smith with duct tape and focused their attention on Mario, shooting him twice in the leg. They ordered Mario to tell them where they could find money and guns in the house, and began ransacking the house when he refused. The men found some money ($800 or so) and a nine-millimeter gun, and they took both of them. That was not enough.

The men asked Mario once more where he hid his money and threatened to kill him if he did not say. Mario lied, telling them they could find some money at his former residence on 12th Avenue. The men shot Mario once more and dragged him outside. Two men got into Mario's car with him and drove to the home on 12th Avenue, while the other two followed in another car.

When they arrived, the men dragged Mario onto the back porch and instructed him to yell for his cousin, who purportedly was inside. When a man and woman appeared, the men forced one or both of them back inside at gunpoint, ransacked the house and ordered the occupants to give them any money they had. The men eventually left, shooting Mario once more on the way out.

After receiving medical care in an emergency room, Mario identified three of the masked men by name. A week later, after being released from the hospital, Mario identified the same three men in a series of photographic lineups.

Mario testified at trial that he knew all three men. He had known two of them, Leonard Baugh and Damian Owes, for more than a year, and he had known Crenshaw since 1992, when the two played in the same baseball league. On the night of the crimes, Mario recognized Crenshaw when he removed his mask during the first home invasion and on the way to the home on 12th Avenue. Mario recognized Baugh's distinctive, high-pitched voice, and he had seen Baugh and Owes at a convenience store two nights before the home invasion.

A Tennessee jury did not buy Crenshaw's defense. It convicted him of a range of robbery, kidnapping and burglary charges. Four and a half years after losing his appeals in state court, Crenshaw filed a federal habeas petition, arguing that the prosecution withheld exculpatory evidence that would have shown Mario testified falsely, *see Brady v. Maryland*, 373 U.S. 83 (1963), and knowingly allowed Mario to give false testimony, *see Giglio v. United States*, 405 U.S. 150 (1972).

To support the *Brady* and *Giglio* claims, Crenshaw submitted four allegedly withheld documents: a six-month lease signed by Mario Mitchell for the residence on 12th Avenue; a police officer's report from the November 10 raid of the 12th Avenue residence; the search warrant from the November 10 raid; and police reports detailing Mario's alleged assault of an unrelated person, John Motley. The documents, claims Crenshaw, would have undermined the credibility of Mario's

testimony.

The district court denied the petition, holding that the claims were procedurally defaulted and time-barred. It granted a certificate of appealability on both claims.

II.

The procedural-default doctrine bars the writ if the state courts reject a federal claim based on an unexcused failure to satisfy state procedural requirements, *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991), and if the petitioner never presented the claims to the state courts but state procedural rules would preclude him from raising them now, *Pudelski v. Wilson*, 576 F.3d 595, 605 (6th Cir. 2009). Crenshaw procedurally defaulted his *Brady* and *Giglio* claims because Tennessee law establishes a one-year limitations period for post-conviction relief and a restriction on successive state petitions. Tenn. Code. Ann. § 40-30-102(a), (c). Crenshaw failed to meet the one-year deadline and cannot sidestep it in view of the successive-petition bar.

Even so, Crenshaw contends that cause and prejudice excuse the default. *See Engle v. Isaac*, 456 U.S. 107, 110 (1982). Two premises of his argument are correct: A defendant may excuse a procedural default by establishing cause and prejudice for it, and a violation of *Brady* (requiring the prosecution to turn over exculpatory evidence in its possession) may establish the requisite cause. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004). But the third premise is not: Crenshaw cannot show that it is reasonably probable that the allegedly withheld evidence would have changed the verdict. *See id.* at 698–99.

Even if Crenshaw had a colorable claim that the government withheld exculpatory evidence (doubtful but we need not decide), he cannot show prejudice from lack of access to the evidence. With some of the evidence mentioned above, Crenshaw maintains he would have been able to prove that Mario was lying about ownership of the 12th Avenue residence and that this would have undermined Mario's credibility. But the theory of impeachment was tangent-filled and speculative. The basic idea was that Mario believed Crenshaw had prompted the police raid on November 10 (which led to drug charges against Mario) and that Mario fingered Crenshaw, as opposed to the real offender, as his assailant in retaliation. Whether Mario did, or did not, own the 12th Avenue residence, however, was only one part of that theory. The more important consideration was whether there was any evidence—any evidence at all—suggesting Crenshaw prompted the police raid or Mario knew about Crenshaw's role in the raid. On that score, there was nothing, defeating any effort to establish a tenable theory of prejudice.

Crenshaw gets no further with a police report indicating that Mario assaulted John Motley several weeks after the burglary due to an unrelated criminal investigation. Crenshaw seems to be using the report as a form of similar-acts evidence to the effect that Mario is the kind of guy who retaliates against people who get him in trouble. But Rule 404 of the Federal Rules of Evidence precludes similar-act evidence and at all events this episode (in which Motley and Mario were investigated by police, and Motley fingered Mario) happened weeks after the underlying incidents, making it still more irrelevant.

Mario Mitchell was unquestionably the victim of multiple assaults and shootings. He had every reason to identify the true assailant as the real assailant. He identified Crenshaw as that assailant based on two views of his face and recognition of his voice, all after having known him the last half-dozen years. Why a reasonable jury would use these tangential pieces of evidence, even if they somehow were admitted, to undermine Mario's eyewitness identification of someone he had known for six years is never plausibly explained. Ownership of the 12th Avenue residence had nothing to do with Mario's repeated identification of Crenshaw, and neither did the Motley incident.

Nor was that the only evidence against Crenshaw. Another eyewitness (Michael Pritchard) testified that one of the cars the defendants drove was a "large, black vehicle," and Crenshaw's mother testified that her car, which police believed matched Pritchard's description, had been stolen on November 11. The same car was later discovered at Crenshaw's grandfather's house. On top of that, Mario's Chevrolet Blazer was recovered at Crenshaw's grandfather's house after the robbery. On this record, the supposed *Brady* evidence does not "undermine confidence in the verdict" or raise any "reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed." *Strickler v. Greene*, 527 U.S. 263, 289–90 (1999).

The *Giglio* claim faces a similar problem because it relies on exactly the same theory—that Mario did not testify truthfully about his ownership of the 12th Avenue residence. Under *Giglio,* the government may not suborn perjury, and a court should set aside a criminal conviction "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976). We may not, however, call for a new trial any time

"a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." *Giglio*, 405 U.S. at 154.

The *Giglio* claim is a variation on the *Brady* theme—that the government knew Mario testified falsely about ownership of the 12th Avenue residence. It is not clear that Mario testified falsely on the point, and more to the point it is far from clear that the government knew otherwise. Either way, for the same reasons his *Brady* claim fails, Crenshaw cannot prove that any of the allegedly false testimony (about ownership of the 12th Avenue residence) had any chance of changing the verdict. The record simply contains too much evidence of Crenshaw's guilt and not enough *Brady* or *Giglio* evidence suggesting his innocence.

We need not reach the district court's additional reason for denying the writ—that it exceeded the one-year limitations bar. 28 U.S.C. § 2244(d)(1). It suffices to resolve this appeal to affirm the district court's conclusion that Crenshaw procedurally defaulted his *Brady* and *Giglio* claims.

III.

For these reasons, we affirm.