**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 19a0304n.06

Nos. 17-1205, 17-1221, & 17-1383

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jun 13, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| BRYAN WATSON (No. 17-1205); DAVID | ) | |
| HANSBERRY (Nos. 17-1221/1383), | ) | **OPINION** |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

Before: BOGGS, KETHLEDGE, and NALBANDIAN, Circuit Judges.

NALBANDIAN, Circuit Judge. Bryan Watson and David Hansberry worked as undercover narcotics agents for the Detroit Police Department. And as it turned out, they were dirty cops—using their positions as police officers to steal drugs and money from drug dealers. But this case is not about whether Defendants committed a crime. Instead, this case is about figuring out *what* crime Defendants committed. The government charged Defendants with conspiracy to commit *extortion* under the Hobbs Act. The jury agreed and returned a guilty verdict. Defendants, however, claim they committed *robbery*, not extortion. This would be a problem for the government because they didn't charge Defendants with robbery. So if the jury convicted Defendants of the wrong crime, we must vacate their sentences.

But Defendants' argument goes only so far. While some of Defendants' conduct might fall under Hobbs Act robbery, other conduct falls under Hobbs Act extortion. This is enough. Said another way, the government introduced enough evidence at trial to support Defendants'

extortion convictions.  Defendants also challenge other aspects of the trial and sentencing, such as comments the district court made during voir dire, the sufficiency of the jury instructions, allegedly false statements from a government witness, and enhancements and inconsistencies with the sentences.  But none of these challenges warrant a retrial or resentencing.  We affirm.

## I.

For years, Defendants stole drugs and money from drug dealers.  The basic con went as follows:  Defendants would raid a house or stop a car (generally with the help of an informant) knowing that drugs and money would be there.  These pretextual raids would surprise the drug-dealing victims, and as several of them testified, would scare them "to death" about getting arrested or hurt.  So the victims would hand over their drugs and money to Defendants.  And once Defendants got what they wanted, they would leave without making arrests or filing charges.  Instead, Defendants would keep the money and sell the drugs (generally with the help of the same informant), splitting the profits.  And if Defendants did report the bust, they would first take some money or drugs "off the top."  For example, if they seized $100,000, they would keep $20,000 and report only $80,000.  Or if they seized ten kilos of cocaine, they would keep two kilos and report only eight kilos.  Other witnesses testified about their expanded interactions with Defendants.  Several victims, facing arrest or criminal charges, agreed to give Defendants drugs and money.  In exchange, Defendants agreed to protect them from arrest or make the charges disappear.

Defendants do not seriously challenge this conduct on appeal—apart from characterizing it as "just part of the job" of an undercover cop.  Rather, Defendants challenge whether they were indicted and convicted of the correct crime.  Defendants argue that, at most, the evidence shows

that they committed *robbery* under the Hobbs Act. *See* 18 U.S.C. § 1951(b)(1). The government, however, charged Defendants with *extortion* under the Hobbs Act. *See id.* § 1951(b)(2). This included one count of conspiracy to commit extortion, six substantive counts of extortion, drug charges, and a firearm charge.

Defendants have a bit of a point. The jury acquitted Defendants of the drug charges, the firearm charge, and all six specific instances of extortion. That means that the jury did not believe, beyond a reasonable doubt, that Defendants extorted drugs and money from the six specific victims listed in the indictment. This left just one crime: conspiracy to commit extortion.

The jury struggled with the conspiracy charge. During deliberations, the jury sent out a question, "must a jury find guilt on at least one other count (3 to 10) for [conspiracy] to apply?" (R. 236 at 5.) The jury was questioning whether it could convict Defendants of conspiracy to commit extortion even if it acquitted Defendants of every specific instance of extortion. The parties agreed that the jury could.

Later, the jury interrupted its deliberations again, telling the district court that it was "deadlocked on the charges." (R. 237 at 5.) The district court, however, read an *Allen* charge to the jury because, at this point, the jury had deliberated for less than two days. The district court reminded the jury of its duties and the importance of a unanimous verdict—and asked the jury to "return to the jury room and resume your deliberations." (*Id.* at 9.) These instructions worked. The jury eventually returned a unanimous verdict, acquitting Defendants of the six substantive counts of extortion, yet convicting Defendants of conspiracy to commit extortion.

3

Defendants argue that this inconsistent verdict shows that something went wrong. According to Defendants, an error occurred because the jury was confused between robbery and extortion. Defendants think the jury improperly convicted them of conspiracy to commit *robbery*, even though they were charged with conspiracy to commit *extortion*.

But this is not the first time we have seen a jury convict a defendant for conspiracy while acquitting them of the underlying substantive charges. *See, e.g.*, *United States v. Myint*, 455 F. App'x 596, 603 (6th Cir. 2012) (finding defendant guilty of conspiracy to defraud Medicare but acquitting him of three counts of Medicare fraud). We explained how this can happen: the jury could acquit the substantive charges "because the government simply had not proved beyond a reasonable doubt that [the defendant] acted on these occasions." *Id.* (citing *United States v. Chen*, 378 F.3d 151 (2d Cir. 2004)). But that does not necessarily mean the government also failed to introduce evidence of the overall conspiracy. This would explain the verdict here.

So to figure out what happened, we must determine whether the government indicted and convicted Defendants of the correct crime. And whether the government introduced enough evidence of the correct crime at trial. We start by evaluating the subtle differences between extortion and robbery under the Hobbs Act.

**II.**

The Hobbs Act makes it unlawful to interfere with commerce "by robbery or extortion." 18 U.S.C. § 1951(a). Robbery "means the unlawful taking or obtaining of personal property from . . . another, against his will, by means of actual or threatened force, or violence, or fear of injury[.]" *Id.* § 1951(b)(1). In contrast, extortion "means the obtaining of property from another, with his

4

consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Id.* § 1951(b)(2). The main difference between robbery and extortion is consent and force. *Ocasio v. United States*, 136 S. Ct. 1423, 1435 (2016). Robbery occurs when property is taken from the victim "against his will." 18 U.S.C. § 1951(b)(1). Extortion occurs when a victim gives up property "with his consent." *Id.* § 1951(b)(2). But this does not mean the victim is happy to give up the property. Instead, consent still occurs if it is "grudging consent"—or if the consent "is merely complying with an official demand." *Ocasio*, 136 S. Ct. at 1435.

This difference can become technical and academic to parse out. But picture it this way: a suspect *robs* someone when he snatches a purse off a victim's arm; a suspect *extorts* someone when he threatens a victim and persuades her to hand over the purse. In both situations, the suspect unlawfully took the purse. But in doing so, the suspect used different methods. In the first scenario, the suspect grabbed the purse away from the victim. But in the second scenario, the victim agreed to surrender the purse. This is the basic difference between "against his will" and "with his consent."

To make things more complicated, extortion also has two different theories of liability. Extortion can occur either (1) through the threat of force, violence, or fear; or (2) through "the color of official right"—i.e., by a public official. *United States v. Kelley*, 461 F.3d 817, 826 (6th Cir. 2006). Under the latter, a public official's extortion may—or may not—include threats of force, violence, or fear. *See id.* at 826. Extortion by a public official does, however, require some quid pro quo. This means that the victim gives up her property to the public official in exchange for something else. *See* Extortion, Black's Law Dictionary 1443 (10th ed. 2014).

5

The quid pro quo requirement comes from the Supreme Court's decision in *Evans v. United States*, 504 U.S. 255, 268 (1992).[1] To establish extortion by a public official, the Supreme Court explained "that the Government need only show that a public official has obtained payment to which he was not entitled, *knowing that the payment was made in return for official acts*." *Id.* (emphasis added). In other words, extortion by a public official is "the rough equivalent of what we would now describe as 'taking a bribe.'" *Id.* at 260; *Collins*, 78 F.3d at 1034 (quoting *United States v. Farley*, 2 F.3d 645, 651 (6th Cir. 1993)).

The Supreme Court also gave several examples of quid pro quo agreements that would constitute extortion. *See Evans*, 504 U.S. at 269–70 (collecting cases). For example, it was extortion when an officer "received $1,000 for not arresting someone who had stolen money." *Id.* at 270 (citing *State v. Barts*, 38 A.2d 838, 841 (N.J. 1944)). Indeed, there was an explicit agreement: a friend delivered the money and "told [the officer] 'that he was giving him that money ($1,000) to keep [the suspect] out of jail,' and [the officer] replied that the girl 'wouldn't go to

---

[1] This is not necessarily the correct path. *See Ocasio*, 136 S. Ct. at 1437 (Thomas, J., dissenting) ("In my view, the Court started down the wrong path in *Evans* . . . , which wrongly equated extortion with bribery."); *Evans*, 504 U.S. at 286 (Thomas, J., dissenting) ("This *quid pro quo* requirement is simply made up."). And the quid pro requirement could be limited to situations in which the alleged extortion is the "receipt of political contributions." *See McCormick v. United States*, 500 U.S. 257, 271 (1991); *see also id.* at 276–77 (Scalia, J., concurring) ("I find it unusual and unsettling, however, to make such a distinction without any hint of a justification in the statutory text: § 1951 contains not even a colorable allusion to campaign contributions or *quid pro quos*."). Still, we are bound by our precedent. *See United States v. Collins*, 78 F.3d 1021, 1035 (6th Cir. 1996) ("We now join these circuits in holding that the *quid pro quo* requirement applies to all § 1951 extortion prosecutions [under color of official right], not just those involving campaign contributions."). And the requirement that the government show a quid pro quo agreement does not change the result for Watson or Hansberry.

jail.'" *Barts*, 38 A.2d at 842; *see also Evans*, 504 U.S. at 270 (citing *White v. State*, 56 Ga. 385, 389 (1876) (explaining that extortion would occur if an officer took money and "agree[d] to use it in settling a pending or threatened prosecution")). Likewise, it was extortion when an officer accepted money for turning a blind eye to illicit activities, such as "the running of a gambling house." *Evans*, 504 U.S. at 270 (citing *State v. Sweeney*, 231 N.W. 225, 228 (Minn. 1930)).

Still, completion of the quid pro quo is not required. *See Evans*, 504 U.S. at 268. Nor is an explicit agreement or any expressed terms. *Id.* at 274 (Kennedy, J., concurring in part and concurring in the judgment). Instead, the quid pro quo can be accomplished through "winks and nods" and "implied from . . . words and actions." *Collins*, 78 F.3d at 1034 n.10 (quoting *Evans*, 504 U.S. at 274 (Kennedy, J., concurring)). This includes a classic "shakedown" situation—where a victim agrees to pay money out of fear or the need for protection. *Ocasio*, 136 S. Ct. at 1435. It is also "sufficient if the public official understood that he or she was expected to exercise some influence on the payor's behalf as opportunities arose"—such as not arresting or charging someone. *United States v. Abbey*, 560 F.3d 513, 518 (6th Cir. 2009). It is this "use of public office to benefit one's personal financial status . . . [that] is precisely the evil that 'under color of official right' extortion was designed to prevent." *United States v. Blandford*, 33 F.3d 685, 699 (6th Cir. 1994).

In sum, for Hobbs Act extortion, the government needed to prove that Defendants conspired to (1) obtain someone else's property; (2) with the victim's consent; and (3) by either (A) threatening force, violence, or using fear to induce consent, or (B) obtaining consent through

their roles as public officials in exchange for something else. *See* 18 U.S.C. § 1951(b)(2); *see also Collins*, 78 F.3d at 1035.

### III.

Defendants' main complaint is that they never had a quid pro quo agreement with any of their victims. Defendants argue that, at most, they snatched drugs and money from unwilling drug dealers, amounting to robbery. But the government sees it differently: Defendants persuaded their victims to hand over drugs and money to avoid getting arrested, amounting to extortion. Defendants make this "robbery versus extortion" argument in two ways. First, Hansberry argues that we should throw out the indictment because it failed to properly charge extortion—and because the indictment included no quid pro quo allegations. Second, Defendants argue that we should throw out the convictions because, at trial, the government failed to introduce any evidence of a quid pro quo agreement between Defendants and their drug-dealing victims.

As a threshold issue, both arguments ignore the alternative theory of liability for Hobbs Act extortion: taking property by threatening force, violence, or using fear to induce consent. *See* 18 U.S.C. § 1951(b)(2); *see also Kelley*, 461 F.3d at 826 (distinguishing the two theories of extortion under the Hobbs Act). This type of extortion occurs when "the defendant purports to have the power to hurt the victim in economic [or physical] terms and fear is induced." *United States v. Valenzeno*, 123 F.3d 365, 369 (6th Cir. 1997); *see also United States v. Billingsley*, 474 F.2d 63, 66–67 (6th Cir. 1973). This form of extortion requires no quid pro quo. And the defendant need not expressly threaten the victim. Instead, "[i]t is enough if the fear exists and the defendant intentionally exploits it." *United States v. Williams*, 952 F.2d 1504, 1513–14 (6th Cir. 1991). In

other words, if the person exploiting the victim's fear induces the victim to give up his property, extortion occurred.

In assessing this fear, "statements by the victim indicating fear of the defendant are admissible to prove the 'force of fear' element of extortion." *United States v. Kilpatrick*, 798 F.3d 365, 386 (6th Cir. 2015) (citation omitted). Indeed, "[t]he victim's fearful state of mind is a crucial element in proving extortion." *Id.* (quoting *United States v. Hyde*, 448 F.2d 815, 845 (5th Cir. 1971)). For example, a couple found themselves in the middle of an IRS audit, facing possible tax evasion charges. *Valenzeno*, 123 F.3d at 367. The couple had "real fears of economic loss or potential imprisonment"—and the defendant exploited those fears to take money from the couple. *Id.* at 369. This was extortion through fear. *See also, e.g.*, *Williams*, 952 F.2d at 1513 (citing *United States v. Lisinski*, 728 F.2d 887, 892 (7th Cir. 1984) (exploiting a restaurant owner's "fear of losing his liquor license" to extract money)).

Here, we have evidence of Defendants exploiting such fears. Several victims testified about their fears of getting arrested or hurt when Defendants conducted their fake raids. One victim testified that, "I was just afraid. I didn't know what to think. I was just terrified." (Renee Williams Test., R. 218 at 185.) Another victim testified, "I was scared"—and explained how this fear kept him quiet after Defendants took his cocaine. (Richard Jones Test., R. 219 at 51–52.) Yet another victim, when Defendants took his money and pills, explained that he "was scared to death"—not only "of being charged with a crime," but also for "[his] life." (Chester Browning Test., R. 220 at 139–42.) And other victims testified that their fears caused them to run away from Defendants, leaving $280,000 worth of cocaine behind. (Rafael Vasquez Test., R. 222 at 109–12.)

In all these situations, Defendants knew their drug-dealing victims would fear getting arrested or injured, and Defendants exploited these fears to take drugs and money from them. This was extortion through fear.

Defendants also ignore the main difference between robbery and extortion: consent. Defendants point to no evidence that they used actual force to take the drugs and money, which would be robbery, as opposed to consent induced by fear, which is extortion. *See United States v. Santos*, 449 F.3d 93, 100–01 (2d Cir. 2006) ("[Defendant's] admission that the plan was to take property through the use of a badge actually bolsters his claim that he was not part of a plan that involved taking property by 'force.'"). Each victim, even if begrudgingly, allowed Defendants to take drugs and money "with his consent."

So under the plain language of 18 U.S.C. § 1951(b)(2), Defendants conspired to (1) obtain someone else's property (drugs and money); (2) with the victim's consent (the drug dealers begrudgingly complied); and (3) induced by fear (of getting arrested or hurt). Thus, we could end our analysis here and affirm the indictment and convictions for extortion. But even if the government were required to also establish a quid pro quo agreement—it did just that.

## A.

*The Indictment*. Hansberry argues that the indictment failed to charge them with extortion. But because Hansberry did not make this challenge before trial, the parties agree that we review the indictment for plain error. And here, the indictment is "construed liberally in favor of its sufficiency." *United States v. Bankston*, 820 F.3d 215, 229 (6th Cir. 2016); *see also* Fed. R. Crim. P. 12(c)(3).

An indictment must include "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). This is not a high burden, which the government can usually satisfy by quoting the words of the statute itself—and including facts and circumstances that give a "general description" of the crime charged. *United States v. McAuliffe*, 490 F.3d 526, 531 (6th Cir. 2007). This combination meets the minimum notice required so the defendant knows the charges against him and can prepare his plea or defense. *See Hamling v. United States*, 418 U.S. 87, 117 (1974). Indeed, even when an indictment cites the wrong statute or omits a relevant statute, we have still refused to render the indictment invalid. *United States v. West*, 562 F.2d 375, 379 (6th Cir. 1977). This is because, "[u]nless the defendant was misled and thereby prejudiced," such errors cannot lead to dismissal of an indictment and reversal of a conviction. Fed. R. Crim. P. 7(c)(2).

The relevant charge here is conspiracy to commit Hobbs Act extortion under 18 U.S.C. § 1951(b)(2). The government filed two indictments against Defendants, the first of which included robbery charges. A year later, the government dropped the robbery charges and filed a Superseding Indictment with new charges. These new charges included conspiracy to commit extortion and six substantive counts of extortion. (*See* Superseding Indictment, R. 79 at 5, 7–10 ("**COUNT ONE** . . . 18 U.S.C. § 1951 – Conspiracy to Obtain Property by Extortion Under Color of Official Right.").)

Under the conspiracy charge in the Superseding Indictment, the government quoted language directly from the statute, alleging that Defendants took drugs and money "by extortion, that is to obtain property from others, *with their consent*, by the wrongful use of actual and

11

threatened force, violence, and fear, and under color of official right." (*Id.* at 5 (emphasis added).) This was the key change in the Superseding Indictment: that Defendants allegedly took the drugs and money with the consent of the drug dealers—rather than taking the drugs and money against their will. (*Compare id.*, *with* Original Indictment, R. 1 at 7.)

The Superseding Indictment also included facts and circumstances that gave a general description of the crime. The government alleged that Defendants conducted pretextual traffic stops, home invasions, and arrests to coerce their victims into giving up their drugs and money. (Superseding Indictment, R. 79 at 3–4.) Defendants accomplished this by "us[ing] their police authority to extort" drug dealers. (*Id.* at 3.) Defendants would then fail to report the drugs or money that they seized. Defendants instead "would divide amongst themselves the money, property, and controlled substances obtained from their victims, and would sell the controlled substances in order to share the proceeds of such sales." (*Id.* at 4.)

Still, Defendants allege that these details were not enough because the indictment did not list an explicit quid pro quo. But an "indictment must be read as a whole, accepting the factual allegations as true, and construing those allegations in a practical sense with all the necessary implications." *McAuliffe*, 490 F.3d at 531 (citing *United States v. Reed*, 77 F.3d 139, 140 n.1 (6th Cir. 1996) (en banc)). And we must read the indictment "liberally in favor of its sufficiency." *Id.*

Here, the Superseding Indictment alleged that Defendants used their positions as police officers "to coerce their victims into complying with their demands and to encourage their victims to flee, leaving behind their controlled substances, money, or personal property." (R. 79 at 3.) A fair reading of this allegation implies that an agreement existed between Defendants and their

victims. Defendants did not simply steal drugs and money. Instead, the indictment alleged that the victims agreed to give up their property so that they could escape arrest. And when read in context with the allegation that Defendants took the drugs and money from the victims "with their consent," the indictment gave Defendants sufficient notice that the government was charging them with conspiracy to commit extortion.

To be sure, the indictment could have provided more allegations detailing the conspiracy, especially considering the volume of evidence introduced at trial. But "we are hard pressed to see how anyone charged in the indictment would not know that he had been charged with the conspiracy." *United States v. Rivera*, 822 F.2d 60, at *2 (6th Cir. 1987) (unpublished table decision). The indictment charged a specific crime under a specific statute. And the indictment gave a "general description" of the crime charged: Defendants took drugs and money from drug dealers—with their consent—by using fear or their position as police officers in violation of 18 U.S.C. § 1951. Thus, Defendants received enough notice that the government was charging them with conspiracy to commit extortion.

**B.**

*Evidence at Trial*. Defendants also argue that the government failed to introduce any evidence of a quid pro quo agreement between Defendants and their victims at trial. Instead, according to Defendants, the government introduced only evidence of robbery. If this is true, one of two things happened, either of which would require a new trial.

One theory is that, during the trial, the government changed the crime that Defendants were charged with. This is called a "constructive amendment" or "variance." *See United States v.*

*Beasley*, 583 F.3d 384, 389 (6th Cir. 2009). And it basically means that the government modified the crime charged by presenting evidence of a different crime. *Id.* This can become a Sixth Amendment violation because the defendant ends up "being tried for a different crime than [ ]he had been indicted for." *Martin v. Kassulke*, 970 F.2d 1539, 1542–43 (6th Cir. 1992). Applying this theory here, the jury could not convict Defendants of *robbery* (even though there was evidence of robbery) because Defendants were only charged with extortion.

The second theory takes the opposite approach: the jury could not convict Defendants of *extortion* (even though Defendants were charged with extortion) because there was only evidence of robbery. This is called a "sufficiency of the evidence" claim, which means that the government stuck with the original crime (as charged) but failed to introduce sufficient evidence to prove the elements of that crime during trial. *See Valenzeno*, 123 F.3d at 368. Under this theory, a reasonable jury could not convict Defendants of extortion because it lacked the evidence to do so. *See Collins*, 78 F.3d at 1029–32.

But these theories are really the same argument made different ways—i.e., the government introduced only robbery evidence at trial. And so, no matter the theory used, both fail if the government did in fact introduce evidence of extortion at trial, including evidence of a quid pro quo agreement between Defendants and their victims. Following a 22-day trial, the district court highlighted such evidence—and rejected Defendants' arguments. (*See* Order Den. Acquittal, R. 139 at 5–8.) We agree.

At trial, the government presented evidence of many quid pro quo agreements between Defendants and their drug-dealing victims. For example, Gary Jackson, Nicholas Simmons, and

Lamont Calhoun all testified that they agreed to give Defendants drugs and money, and in exchange, Defendants agreed to not arrest them or file charges. This kind of agreement is a quintessential example of extortion by a public official. *See, e.g.*, *Evans*, 504 U.S. at 270 (citing *Barts,* 38 A.2d at 844).

*Gary Jackson*. Jackson was a drug dealer who wanted to work for Defendants. He got his chance when he learned that a Mexican cartel had just sold $3 million worth of cocaine in Detroit. And Jackson knew when the cartel was planning to drive its profits back to Mexico. So Jackson contacted Watson and offered to give Defendants the date and location of the money's departure if he received a cut. Watson agreed with the plan—and told Jackson that he would receive $300,000 "off the top." (Trial Tr., R. 230 at 20.) Jackson tipped off Defendants and the police stopped the truck and seized the money.

But Defendants did not pay Jackson as promised. Instead, Jackson's contact told him that Defendants "didn't have a chance to get any money" before other police officers arrived at the scene. (*Id.* at 29.) This did not make Jackson happy. Indeed, on the news, Jackson learned that the police reported "that only $2.1 million was seized"—rather than the $3 million. (*Id.* at 29–30.) In other words, Defendants took $900,000 "off the top" from the seizure and then lied to Jackson. But eventually, Defendants set up a meeting with Jackson at a hotel to discuss what happened. Jackson agreed to the meeting but decided to bring a secret recording device.

At the meeting, Defendants paid Jackson $250,000 with official police funds for his role as an informant (rather than with money "off the top"). Hansberry then explained why he "had to do it this way." (Tr. of Hotel Recording, R. 165–2 at 13.) Hansberry needed to make sure that

Jackson wasn't himself an undercover agent. But now, because Defendants knew Jackson was not a spy, Hansberry would have no problem working with him. Jackson would keep tipping off Defendants—and they would all get paid "off the top" from money seized. (*See* Trial Tr., R. 230 at 49.) According to Hansberry, they could become "millionaires doing this." (Tr. of Hotel Recording, R. 165–2 at 15.)

For this relationship to work, Hansberry told Jackson that he and Watson would be his "get out of jail free card." (*Id.* at 15.) Hansberry told Jackson to keep selling drugs, and if he "got popped, I'll get you. I'll come get you." (*Id.*) Hansberry reiterated this agreement: "If you work for me you got my number. . . . You get popped, you out here making moves, you get popped, I'll come get you. . . . I'll come get you off your case. You ain't got to worry about that." (*Id.* at 16.) Said another way, Hansberry agreed to protect Jackson.

But Jackson was not just worried about himself. Jackson also did not want "his brothers" getting arrested. (*Id.* at 20, 23 ("I just want this for the paying, I ain't never cared about putting a brother in jail.").) So Hansberry agreed to protect them, too. If Jackson tipped off Defendants about drugs or money for the taking—but it involved Jackson's friends—Hansberry guaranteed, "we ain't going to lock them up." (*Id.* at 22.) After the meeting, Jackson continued to work with Defendants. Jackson even called Defendants his "super friends"—because "super friends come to your rescue, like comic characters." (Trial Tr., R. 230 at 61.) In sum, Jackson agreed to give Defendants drugs and money, and in exchange, Defendants agreed to keep him and his friends out of jail. This was a quid pro quo.

16

*Nicholas Simmons*. Simmons was also a drug dealer. And in 2011, Defendants raided Simmons' house "looking for guns and money, dope and money." (Trial Tr., R.221 at 17, 24.) During the raid, Defendants took Simmons into his basement and told him "to get in touch with them if [he] didn't want to go to jail." (*Id.*) Defendants then took a duffle bag from Simmons containing over $300,000 in drug money. Defendants also took cocaine and guns. Defendants left without arresting or charging Simmons.

But Simmons eventually saw Hansberry again, this time at a topless bar. The two of them talked—and Hansberry repeatedly asked Simmons "what do you want to do?" (*Id.* at 41–42.) Simmons interpreted this as a request to become an informant, which he rejected. Instead, Simmons asked Hansberry point blank, "hey, are you going to charge me or not?" (*Id.* at 43–44.) But Hansberry insisted that "[h]e wanted to work something out." (*Id.* at 44.) This led to another conversation, where Hansberry wanted "[m]oney and dope" from Simmons. In return, Simmons wanted Defendants to leave him alone. So Simmons and Hansberry agreed to a deal: Simmons would leave five kilos of cocaine and $100,000 in a vacant house for Hansberry. Simmons got the drugs and money, stashed it in a closet in a vacant house, and called Hansberry. He watched nearby to confirm the pick-up. Afterwards, Hansberry told Simmons that "he got it and everything was cool." (*Id.* at 50.) Defendants then left Simmons alone as promised. Just as in the deal with Jackson, Simmons agreed to give Defendants drugs and money and, in exchange, Defendants agreed to keep him out of jail. This was a quid pro quo.

*Lamont Calhoun*. Calhoun was also a drug dealer—working with Watson for years to "rip-off" drug dealers. Indeed, drug dealing was a family affair for Calhoun. So when his cousin was

17

arrested on drug charges, Calhoun reached out to Watson to see if he could help. But Watson's help came at a price: he was willing "to do things to help if [the cousin] did certain things." (Trial Tr., R. 227 at 88.) These "things" included giving Defendants $25,000 and finding "at least half a kilo [of cocaine]" for Defendants. (*Id.*) In other words, Watson wanted Calhoun's cousin to give Defendants drugs and money "in order to make the charges go away." (*Id.*)

Calhoun's cousin agreed and paid Watson the $25,000. For the drugs, Watson suggested a familiar tactic: Calhoun told his cousin to "put some drugs inside of a house, like one of [Calhoun's] rental properties." (*Id.* at 89.) Once the cousin stashed the drugs, they notified Watson and "let [the police] raid the house and . . . find the dope." (*Id.* at 89–90.) And just like Jackson and Simmons, Calhoun and his cousin made sure that "no one would be arrested." (*Id.*) After that, the cousin's legal problems went away. And Calhoun continued to work with Watson. This was a quid pro quo.

So even if the Hobbs Act required the government to introduce evidence of a quid pro quo agreement between Defendants and their victims, the government did just that. Defendants took drugs and money to provide protection for Jackson and his friends—and Defendants took drugs and money to make charges "go away" for Simmons and Calhoun's cousin. This is enough to show that Defendants entered quid pro quo agreements with their victims. This evidence is even more powerful because, for whatever reason, this conduct did not support any of the substantive counts of extortion in the Superseding Indictment. This additional evidence provides an example on how the jury could acquit Defendants on the substantive counts—but not on conspiracy.

**C.**

Defendants make one final "robbery versus extortion" argument. Defendants point to trial testimony where various lay witnesses used the words "rip" or "robbery" to describe Defendants' conduct (rather than use the word "extort"). Thus, according to Defendants, this word choice suggests that Defendants committed robbery.

But as we've already described, the difference between "robbery" and "extortion" under the Hobbs Act is academic. They are legal terms—not everyday terms. So when a lay witness used one of these terms, such as "rip" or "robbery," this usage does not necessarily mean robbery to the exclusion of extortion.

Instead, terms often have "a separate, distinct and specialized meaning in the law different from that present in the vernacular." *United States v. Ahmed*, 472 F.3d 427, 434 (6th Cir. 2006) (discussing terms such as "co-conspirators," "drug trafficking," and "falsity"). Witnesses often use non-technical words in their testimony without implicating legal conclusions. *Id.* For example, the use of "robbery" by a lay-witness is likely shorthand for the general idea of taking someone's property. *See, e.g.*, Webster's Third New Int'l Dictionary 1964 (1993) ("Rob indicates the taking of another's property either by such felonious methods as violence, intimidation, or fraud, or, by extension, by any unjust procedure."). And this common usage does not imply the inclusion (or exclusion) of the victim's consent. Indeed, the exact definitions of terms like burglary, robbery, theft, and larceny "vary from jurisdiction to jurisdiction . . . and overlap to a degree." Bryan A. Garner, *Garner's Modern American Usage* 120 (3d ed. 2009). This is why "nonlawyers often consider the words synonymous." *Id.* And the common usage of other terms

at trial—such as "extortion," "bribery," "rips," "hitting a lick," and other slang—just created additional ways to say the same thing: the taking of someone's property.

In sum, the general use of the words "rob," "rip," or "robbery" by lay witnesses cannot change the crime charged from extortion to robbery. As a result, there was no amendment or variance to the charges in the Superseding Indictment. And there was enough evidence to convict Defendants of conspiracy to commit extortion.

## IV.

*Brady/Giglio Violation*. Defendants raise various other issues with their trial and sentences. As we already explained, Gary Jackson testified that Defendants took $900,000 "off the top" from a Mexican cartel bust. During cross-examination, Defendants attacked Jackson and his credibility. One attempt to impeach Jackson relied on a recording of a phone call between Jackson's phone and another drug dealer. Defendants wanted to use the recording to show that Jackson knew Defendants did not steal the missing $900,000. Instead, Defendants argue that, in the recording, Jackson admits that "Old School and Little" took the money. But Defendants ran into a problem when asking Jackson about the recording:

> Q: You recognize the voices on there?
> A: No, not really.
> Q: You don't?
> A: No.
> Q: It's not you?
> A: Turn it up a little bit.
> Q: Sorry?
> A: Turn it up a little bit.

20

> Q:  Okay . . . Start it over. . . . You recognize the voice of the person you're speaking to as Frederick Tucker?
>
> A:  Okay.
>
> Q:  Yes?
>
> A:  That's Fred Tucker, yes.
>
> Q:  That is?
>
> A:  Yes.
>
> Q:  And you, correct?
>
> A:  I really couldn't tell honestly if that was me, sir.  I'm just being honest.

(Trial Tr., R. 230 at 118.)

When Jackson testified that he could not recognize his own voice on the recording, the district court excluded the evidence for lack of authentication.  But Defendants claim that Jackson was lying on the witness stand—and the government knew it.  Defendants thus argue that the government suppressed evidence favorable to them in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  Defendants argue that the government "failed to correct false testimony that [it] knew, or should have known, to be false." *Rosencrantz v. Lafler*, 568 F.3d 577, 583 (6th Cir. 2009).  To prove this type of claim, Defendants must show that "(1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Id.* at 583–84.

Defendants cannot meet this burden.  To begin with, we don't know whether Jackson actually lied.  For example, if Jackson said he never had a conversation with Tucker—or that he didn't even know Tucker—we would know he lied.  But here, Jackson testified that he "really couldn't tell honestly if that was me" on the recording.  We have no way of knowing whether, in that moment, Jackson could or could not recognize his own voice.  This is especially true because

Jackson had trouble hearing the recording: he asked Defendants' counsel twice to "turn it up a little bit." Thus, Jackson's testimony focused on whether he could hear and recognize the voice on the recording (which could be true or false)—not whether the voice on the recording was in fact his (which we know is true). Indeed, counsel for Defendants seemed to concede this point by not questioning Jackson further about the conversation, instead responding, "Fair enough." In other words, "it is not clear that [Jackson] testified falsely on [this] point, and more to the point[,] it is far from clear the government knew otherwise." *See Crenshaw v. Steward*, 502 F. App'x 491, 495 (6th Cir. 2012). This defeats Defendants' claim.

Still, even if Jackson lied (and the government knew it), the recording would not have changed anything. Contrary to Defendants' argument, the recording does not show that "Old School and Little" (rather than Defendants) were responsible for the $900,000 theft. This admission is simply not in the recording. As a result, even if the district court had admitted the recording, Defendants cannot satisfy the materiality requirement for a *Brady/Giglio* claim: that "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Rosencrantz*, 568 F.3d at 584 (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976)). We reject Defendants' argument.

## V.

Defendants' next argument takes aim at statements the district court made during trial. According to Defendants, the district court made misstatements about reasonable doubt, the burden of proof, and whether the Superseding Indictment charged Defendants with robbery. These misstatements allegedly confused and misled the jury. Defendants also complain that the jury

instructions were wrong, which further confused the jury. So when the jury began its deliberations, Defendants argue that it didn't know the correct standards to follow.

But because Defendants did not object at trial, they admit the plain-error standard of review applies here. "Plain error 'requires a finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice.'" *United States v. Mahbub*, 818 F.3d 213, 229 (6th Cir. 2016) (quoting *United States v. Semrau*, 693 F.3d 510, 528 (6th Cir. 2012)). Defendants cannot meet this high burden. Indeed, even if the district court's statements during trial were capable of prejudicing Defendants, the district court fixed any problems when it made subsequent clarifying statements and properly instructed the jury before deliberations. *See United States v. Calandrella*, 605 F.2d 236, 254–55 (6th Cir. 1979) (dismissing the district court's "concededly inadvertent remark" because "the court's curative instruction was adequate to eliminate any possible prejudice and reject the defendants' claim that the jury was likely misled"); *see also People of Territory of Guam v. Ignacio*, 852 F.2d 459, 461 (9th Cir. 1988) (finding no reversible error where "the trial judge used the correct instruction at the end of trial").

The misstatements allegedly began towards the end of jury selection, when the district court discussed the concept of reasonable doubt and the burden of proof. The district court made several statements that Defendants characterize as "shifting" or "lowering" these standards. For example, the district court explained that "the issue of reasonable doubt is significant and substantial and it means the government has to . . . submit proof beyond just 51 to 49 [percent][,] but beyond a reasonable doubt." (Voir Dire Tr., R. 216 at 180.) The district court continued: "on the other hand, there's not an obligation to eliminate all doubt." Defendants read these statements

as allowing the jury to return a guilty verdict even if it had reasonable doubts—and that the statements improperly "encouraged the jury to think [of reasonable doubt] in terms of a mathematical formulation."

Defendants also alleged that the district court made misstatements when it discussed its own role during trial. When telling the jury to focus on the lawyers, and not the judge, the district court explained, "it's really up to [the lawyers] to do what they need to do to prove *or disprove the charges*." (Trial Tr., R. 217 at 20 (emphasis added).) And later, the district court made another comment to the jury: "we are fairly deep into the government's case now. I don't know how deep, but we've heard a lot of witnesses and you're probably beginning to see *a pattern of evidence*." (Trial Tr., R. 220 at 198–99 (emphasis added).) Defendants argue that these comments improperly shifted the burden of proof from the government (who had to prove its case) to Defendants (who were not required disprove the government's case).

But the district court qualified these statements—and explained that it would give the jury detailed instructions to follow at the end of trial. (*See* Trial Tr., R. 216 at 179–80 ("Reasonable doubt I'll give you really specific instructions on, okay? And I may not have explained reasonable doubt as clearly as I should have because I didn't give you the instruction."); R. 221 at 5 ("And when you were leaving I said a couple of things . . . [but] [t]here's no pattern that I know of being developed. . . . And most importantly, what I say is not evidence. And what you're going to do when I instruct you is go back in the jury room and deliberate on the evidence and make your decision on the verdicts in light of that.").)

24

And that's exactly what happened. At the close of trial, the district court instructed the jury on both reasonable doubt and the burden of proof. For both, the district court read, word-for-word, our approved pattern jury instructions. (*Compare* R. 235 at 11–12, *with* Pattern Crim. Jury Instr. 6th Cir. 1.03(4)–(5) (reasonable doubt); *and compare* R. 235 at 11, *with* Pattern Crim. Jury Instr. 6th Cir. 1.03(1)–(3) (burden of proof).) Defendants admit these are good instructions. So when the jury began its deliberations, it knew the correct standards to follow because these instructions fixed any earlier misstatements or lingering confusion. Indeed, the jury took these correct, written instructions with them into deliberations—as opposed to any passing remarks made weeks earlier.

The district court then moved to specific jury instructions for each count in the Superseding Indictment. This is when Defendants claim the district court made another mistake. When addressing conspiracy to commit extortion, the district court explained:

> What the government must prove is that there was a mutual understanding, either spoken or unspoken, between two or more people to cooperate with each other to extort money and property from other persons. This is essential. . . . One more point about the agreement. The indictment here accuses the defendants of conspiring to commit several acts **of robbery and extortion**. The government doesn't have to prove that the defendants agreed to commit all these crimes, but the government must prove an agreement to commit at least one of them for you to return a guilty verdict on the conspiracy charge.

(Jury Instructions, R. 235 at 20 (emphasis added).) But this statement was not entirely accurate. As we know, the Superseding Indictment charged Defendants with just extortion—not "robbery and extortion." The district court, however, did not end its instructions here.

When we review jury instructions, we must evaluate the instructions "not in isolation but in the context of the entire charge." *Jones v. United States*, 527 U.S. 373, 391 (1999); 35B C.J.S. Fed. Civ. Pro. § 1012 ("Instructions must be regarded as a series and considered as a whole and not in their individual parts."); *Cox v. Treadway*, 75 F.3d 230, 237 (6th Cir. 1996) (same). And when the jury is provided with instructions that "mirror or track" our own pattern instructions, we generally do not find those instructions misleading or erroneous. *See, e.g.*, *Semrau*, 693 F.3d at 528 (quoting *United States v. Damra*, 621 F.3d 474, 499–500 (6th Cir. 2010)).

Here, the district court continued to explain conspiracy and extortion using our pattern jury instructions. (*See* Jury Instructions, R. 235 at 21 (following Pattern Crim. Jury Instr. 6th Cir. 3.03(2)); *see also Mahbub*, 818 F.3d at 229–30 (approving this instruction).) And when it came to the underlying substantive counts, the district court explained extortion again—including the different ways the government could prove extortion under the Hobbs Act. This included one instruction for extortion using threatened force, violence, or fear (R. 235 at 25 (following Pattern Crim. Jury Instr. 6th Cir. 17.01)); and a separate instruction for extortion by a public official. (*Id.* at 25–26 (following Pattern Crim. Jury Instr. 6th Cir. 17.02).) Indeed, under the latter, the district court even explained the quid pro quo requirement: "If a public official accepts or demands property in return for promised performance or non-performance of an official act, then the official is guilty of extortion." (*Id.*)

So while the district court did use the word "robbery" in one stray instance, the instructions otherwise only describe extortion. The district court explained the individual elements of extortion and the different ways Defendants could commit extortion under the Hobbs Act. In contrast, there

26

is no other reference or mention of "robbery" in the instructions. As a result, there is no clear error when we review and read the entire instructions. We affirm the guilty verdicts.

## VI.

*Sentencing*. The district court then moved to sentencing, holding separate hearings for Hansberry and Watson. The district court sentenced Hansberry to 155 months in prison. In contrast, the district court sentenced Watson to only 108 months, much less than Watson's recommended Guidelines range of 121 to 151 months.

The major issue at sentencing was Defendants' "loss amount" under the Sentencing Guidelines and whether the district court should include the $900,000 from the Mexican seizure. *See* U.S.S.G. § 2B1.1(b)(1)(H). The district court ultimately found that it should count the $900,000 and applied a 14-level enhancement to both Hansberry and Watson.

"We review a district court's loss calculations under the Guidelines for clear error." *United States v. Gray*, 521 F.3d 514, 542 (6th Cir. 2008). "In challenging the court's loss calculation, [a defendant] must carry the heavy burden of persuading this Court that the evaluation of the loss was not only inaccurate, but outside the realm of permissible calculations." *Id.* at 543 (quoting *United States v. Hamilton*, 263 F.3d 645, 654 (6th Cir. 2001)). Hansberry cannot meet this heavy burden. Indeed, he provides only a cursory challenge on the loss-amount determination. (*See* Hansberry's Br. at 68–70 (attacking Jackson's credibility).)

Watson, however, makes a different argument: he believes the district court failed to make an independent determination of whether this loss amount should apply to him. (*See* Watson's Br. at 33 (relying on *United States v. Corsey*, 723 F.3d 366, 377 (2d Cir. 2013).) In other words,

Watson thinks the district court failed to distinguish between his culpability and Hansberry's culpability in the $900,000 theft. And to be sure, the government admits that "the district court's reasoning could be clearer." (Gov't Br. at 91.)

The two sentencing hearings occurred back-to-back. During Hansberry's sentencing, the district court discussed the $900,000 and whether it should count towards Hansberry's loss amount. Watson's counsel, recognizing the overlap on the issue, asked the district court "to be heard on" the issue before the district court sentenced Hansberry. (Sentencing Tr., R. 178 at 28.) But the district court denied this request, explaining, "I'm going to defer that because . . . I might make a different ruling in . . . different cases, frankly." (*Id.*) For Hansberry, the district court counted the $900,000. In doing so, the district court explained the powerful impact of Jackson's secret recording: "I remember this very vividly, the tape that Mr. Jackson made of Mr. Hansberry that corroborated what had happened and what was going to happen in the future." (*Id.* at 29.)

Watson's sentencing hearing came next. The government and Watson argued, at length, about whether the district court should count the $900,000 towards Watson. Watson's argument, like Hansberry's, focused mainly on attacking Jackson's credibility. That was, until the district court changed topics: "Let me engage something a little broader here. My overall sense, based on . . . the evidence at the trial, was that . . . Watson was—he was not the . . . mastermind, he was not the leader." (Sentencing Tr., R. 179 at 16.) This led to a specific question. If the district court determined that the $900,000 seizure occurred, "is there any way that the relationship or the facts of the seizure . . . would get Mr. Watson out of the application of this particular enhancement?" (*Id.*) Put differently, the district court was concerned that Watson's culpability in the $900,000

theft was less than Hansberry's. This question shows that the district court considered the very issue that Watson now claims it ignored.

Unsurprisingly, both sides had different takes. Watson argued that no testimony implicated him with the theft. But the government reminded the district court that Watson was Jackson's original contact for the Mexican cartel theft. (*See id.* at 57 ("[I]t was Mr. Watson and not Hansberry who first told Mr. Jackson he'd get $300,000 off the top of that $3 million seizure[.]").) And the government pointed back to Jackson's secret recording, where Watson admitted that he first told Jackson that Defendants would protect him.

Ultimately, the district court ended up somewhere in the middle. First, it recognized that Watson was present when Jackson made his secret recording—and that he was involved with the theft. But at the same time, the district court "didn't believe Watson found himself in the same position in this conspiracy that Hansberry did." (*Id.* at 39.) And that Watson's involvement "was at a lower level . . . probably less involved than Mr. Hansberry." (*Id.* at 62 (detailing the "compelling testimony" from the FBI agent, who explained that Watson took less money during the conspiracy).) As a result, the district court applied the 14-point enhancement for the $900,000 theft. But Watson also received a downward variance for his reduced culpability, lowering his possible sentence from 121 to 151 months to 97 to 121 months.

Still, although the district court imposed a shorter sentence, it explained that Watson's variance "in no way is to undercut the validity and strength of the evidence lodged by the government against Mr. Watson because I do believe that the evidence on [conspiracy] proved beyond a reasonable doubt guilt on that count." (*Id.* at 63.) And the district court explained that

the "balance of the evidence shows" that the $900,000 applied to Watson. Said another way, although Watson's culpability was less—it was not zero.

In sum, the district court did exactly what Watson claims it failed to do: make an independent determination of the loss amount as it applied to Watson. Indeed, Watson received a downward variance specifically because the district court found him less culpable than Hansberry in the $900,000 seizure. As a result, the district court did not commit error, much less clear error, in calculating Watson's loss amount.

*Double Counting*. The district court also applied additional enhancements for Hansberry. Hansberry received a four-level enhancement for being a public official, under U.S.S.G. § 2C1.1(b)(3), and another two-level enhancement for being a manager or supervisor in the criminal activity, under U.S.S.G. § 3B1.1(c). Under the latter enhancement, the district court found Hansberry to be "at the top of the chain" of the conspiracy. Hansberry claims that these enhancements amount to "double counting."

We review a district court's sentencing determination "under a deferential abuse-of-discretion standard for reasonableness." *United States v. Taylor*, 800 F.3d 701, 712 (6th Cir. 2015). "Double counting occurs when precisely the same aspect of the defendant's conduct factors into his sentence in two separate ways." *United States v. Battaglia*, 624 F.3d 348, 351 (6th Cir. 2010) (quoting *United States v. Moon*, 513 F.3d 527, 542 (6th Cir. 2008)) (brackets omitted). "But no double counting occurs if the defendant is punished for distinct aspects of his conduct." *Id.*

Here, the district court applied two distinct enhancements. Hansberry received a four-level enhancement for being a public official, under U.S.S.G. § 2C1.1(b)(3). And he received a separate

two-level enhancement for being a manager or supervisor in the criminal activity, under U.S.S.G. § 3B1.1(c). These enhancements punish "different aspects of his conduct." The first enhancement is for Hansberry's role as a cop—and the second enhancement is because Hansberry was a leader in the conspiracy. So Hansberry could have received the leadership enhancement even if he weren't a cop—and vice versa. *See United States v. Delano*, 99 F.3d 402, at *1 (2d Cir. 1995) (unpublished table decision) (explaining that no "double count[ing]" occurred under U.S.S.G. §§ 2C1.1(b) and 3B1.1(c) because "these sections concern different aspects of . . . criminal conduct"). This is not double counting.[2] The district court did not abuse its discretion in applying the enhancements.

*Different Sentences.* Finally, Hansberry complains that his sentence was unreasonable because he received a harsher sentence than Watson and the other co-defendants. "For a sentence to be substantively reasonable, it must be proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purpose of [18 U.S.C.] § 3553(a)." *Taylor*, 800 F.3d at 713 (quoting *United States v. Vowell*, 516 F.3d 503, 512 (6th Cir. 2008)). We "review all challenges to the substantive reasonableness of a sentence for abuse of discretion." *Id.* (quoting *United States v. Richards*, 593 F. App'x 500, 504 (6th Cir. 2014)). And we presume a sentence is reasonable when, like here, it is within the Guidelines range. *United States v. Vowell*, 516 F.3d 503, 509 (6th Cir. 2008).

---

[2] The cases Hansberry relies on, both of which declined to find any double counting, do not require a different result. *See United States v. Partida*, 385 F.3d 546, 567 (5th Cir. 2004); *United States v. Powers*, 168 F.3d 741, 751 (5th Cir. 1999).

To begin with, this objection stems from 18 U.S.C. § 3553(a)(6), which instructs courts "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." But when making these comparisons, "this factor concerns *national* disparities between defendants with similar criminal histories convicted of similar criminal conduct—not disparities between codefendants." *United States v. Conaster*, 514 F.3d 508, 521 (6th Cir. 2008). Thus, Hansberry's argument about his co-defendants fails.

Regardless, Hansberry was not similarly situated with the other defendants. *See, e.g.*, *United States v. Hunter*, 540 F. App'x 498, 500 (6th Cir. 2013). For example, Hansberry was a sergeant and received an enhancement for his leadership role—while Watson was not and did not. Hansberry had a different Guidelines range with a different level of culpability, warranting a different sentence. As a result, the district court did not impose a substantively unreasonable sentence. We affirm the sentences.

\*     \*     \*

We affirm the district court and the Defendants' sentences in all respects.